**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                          CRIMINAL ACTION NOS.  2:13-cr-00091-7 & -4

JAMAA I. JOHNSON &
DARRELL E. GILLESPIE,

                    Defendants.

**MEMORANDUM OPINION & ORDER**

Pending before the Court are Defendant Jamaa Johnson's ("Johnson") Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, (ECF No. 775), and Supplemental Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, (ECF No. 801).  Also before the Court are Defendant Darrell Gillespie's ("Gillespie") Motion for New Trial, (ECF No. 765), and Supplemental Motion[ ] for New Trial or Judgment of Acquittal, (ECF No. 815).  For the reasons provided herein, the Court **DENIES** the motions.

*I.  BACKGROUND*

A Grand Jury sitting in Charleston, West Virginia, charged both Johnson and Gillespie on April 30, 2014, with eight counts of criminal conduct in a fourteen-count Fifth Superseding

Indictment ("the Indictment"), (ECF No. 418).   The charges were based on an alleged conspiracy occurring over a ten-month period in 2011 and 2012 in Kanawha County and McDowell County, West Virginia, and elsewhere, to unlawfully obtain from drug dealers personal property, including controlled substances, firearms, and money, "by means of actual and threatened force, violence, and fear of immediate injury . . . ."   (*Id.* at 1–2.)   Trial commenced on January 13, 2015.   (ECF No. 749.)

Based on the Indictment, (ECF No. 418), the jury returned a verdict on January 28, 2015, finding Johnson guilty of the following charges:

Count One:      Conspiracy to Commit Armed Robberies in violation of 18 U.S.C. § 1951;

Count Two:       Conspiracy to Use Firearms in Crimes of Violence in violation of 18 U.S.C. § 924(o); and

Count Thirteen:   Witness Tampering in violation of 18 U.S.C. § 1512(b)(1).

(ECF No. 658.)   Accordingly, the Court adjudged Johnson guilty on Counts One, Two, and Thirteen of the Indictment.   (ECF No. 727 at 36.)   The jury acquitted Johnson as to Counts Three, Four, Seven, Eight, and Nine of the Indictment.   (*Id.*)

The jury's verdict found Gillespie guilty of the following charges:

Count One:      Conspiracy to Commit Armed Robberies in violation of 18 U.S.C. § 1951;

Count Two:       Conspiracy to Use Firearms in Crimes of Violence in violation of 18 U.S.C. § 924(o);

Count Five:      Robbery Affecting Interstate Commerce in violation of 18 U.S.C. §§ 1951 and 2;

Count Six:      Carrying a firearm in a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) arising out of the acts of a co-conspirator;

Count Ten:    Possessing, Concealing, and Storing Stolen Firearms and Ammunition in violation of 18 U.S.C. §§ 922(j), 924(a)(2), and 2;

Count Eleven:    Robbery Affecting Interstate Commerce in violation of 18 U.S.C. §§ 1951 and 2;

Count Twelve:    Brandishing a Firearm in a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) arising out of the charge of Robbery Affecting Interstate Commerce in Count Eleven, and arising out of the acts of a co-conspirator; and

Count Fourteen:    Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 371 by conspiring to corruptly endeavor to influence, obstruct, or impede the due administration of justice in this case by encouraging and soliciting false testimony in violation of 18 U.S.C. § 1503.

(*See* ECF No. 658.)   Accordingly, the Court adjudged Gillespie guilty on Counts One, Two, Five, Six, Ten, Eleven, Twelve, and Fourteen of the Indictment.   (ECF No. 727 at 35–36.)   Trial concluded on January 28, 2015.   (*Id.* at 39.)

After receiving new counsel, Johnson's deadline to file post-trial motions was extended to July 20, 2015.   (ECF No. 762.)   Johnson filed his Motion for Judgment of Acquittal or, in the Alternative, for a New Trial on July 20, 2015.   (ECF No. 775.)   The Government responded to the motion on August 10, 2015.   (ECF No. 777.)   Subsequently, the Court granted Johnson's Motion to Hold in Abeyance Further Proceedings Pending Supreme Court Ruling.   (ECF No. 788.)   Following the issuance of the Supreme Court's opinion in *Taylor v. United States*, 136 S. Ct. 2074 (2016), Johnson filed his Supplemental Motion for Judgment of Acquittal, or in the Alternative, for New Trial on July 7, 2016.   (ECF No. 801.)   The Government responded to the motion on August 11, 2016, (ECF No. 816), and Johnson filed a reply on August 18, 2016, (ECF No. 818).

3

After granting no less than five extensions of the deadline to file post-trial motions, the Court ordered Gillespie to file post-trial motions forthwith on June 23, 2015. (ECF No. 764.) Gillespie filed his Motion for New Trial on June 24, 2015. (ECF No. 765.) The Government responded to the motion on July 14, 2015. (ECF No. 773.) Subsequently, the Court granted Gillespie's Motion for Stay or Abeyance and continued generally Gillespie's sentencing pending the Supreme Court's decision in *Taylor*. (ECF No. 787.) Following the issuance of that decision, Gillespie filed a Motion for Leave to File Supplemental Post-Trial Motions, (ECF No. 806), which the Court granted. (ECF No. 811.) In accordance with that order, Gillespie filed his Supplemental Motion for New Trial or Judgment of Acquittal on July 27, 2016, (ECF No. 815), and the Government responded on August 26, 2016, (ECF No. 821).

The Court held an initial hearing on the motions on August 30, 2016, during which the Court ordered both Defendants Johnson and Gillespie to file additional briefing addressing the following four issues:

(1) [W]hether Defendant raised any objection during the trial in this case regarding either clause of 18 U.S.C. § 924(c)(3);

(2) whether Defendant's legal arguments regarding 18 U.S.C. § 924(c)(1)(A) and 924(o) that he raised in his Supplemental Motion for New Trial or Judgment of Acquittal and Memorandum Thereon (the "Supplemental Motion"), (ECF No. 815), are brought as a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, a motion for a new trial under Federal Rule of Criminal Procedure 33, or under both of these procedural vehicles;

(3) what standard the Court should employ when addressing Defendant's legal arguments regarding 18 U.S.C. § 924(c)(1)(A) and 924(o) in the Supplemental Motion; and

(4) if only a portion of the Court's jury instructions as to a particular charge are rendered incorrect by subsequent developments in the law, what standard the Court should employ when determining whether the conviction for that charge nonetheless survives any subsequent developments.

(ECF Nos. 826, 827.)   On September 27, 2016, Johnson, Gillespie, and the United States all filed their supplemental memoranda.   (ECF Nos. 833, 834, 835, 836.)   The Court held a final motions hearing on October 7, 2016, to address the arguments contained in the pending motions.   (ECF Nos. 837, 838.)   The motions are fully briefed and argued and are ripe for adjudication.

## II.   LEGAL STANDARD

### A.   Rule 29—Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 directs a court, upon a defendant's motion after the close of evidence and before submission to the jury, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."   Fed. R. Crim. P. 29(a). Nevertheless, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later," regardless of whether the defendant previously moved for a judgment of acquittal before the case was submitted to the jury.   Fed. R. Crim. P. 29(c)(1), (3).   The court must determine whether "the jury's verdict is supported by 'substantial evidence,' that is, 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilty beyond a reasonable doubt.'"   *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)).   *See also United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (citing *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010)).

To determine whether a defendant meets the "heavy burden" provided under the rule, the question becomes whether "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt."   *Hickman*, 626 F.3d at 763 (quoting *United States v. Bynum*, 604 F.3d 161,

166 (4th Cir. 2010) (internal quotation marks omitted), *cert. denied*, 560 U.S. 977).   The court must "view[ ] the evidence in the light most favorable to the government," keeping in mind that "the jury . . . weighs the credibility of the evidence and resolves any conflicts in the evidence presented."   *McLean*, 715 F.3d at 137 (quoting *Burgos*, 94 F.3d at 862).    If multiple interpretations can be reasonably deduced from the evidence, "the jury decides which interpretation to believe."   *See id.* (citing *Burgos*, 94 F.3d at 862).   Reversal of a conviction is traditionally required when, regardless of proper jury instructions, "no rational trier of fact could find guilt beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 317 (1979) (citations omitted).

   B.   *Rule 33—Motion for New Trial*

   "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."   Fed. R. Crim. P. 33(a).   *See also United States v. Souder*, 436 F. App'x 280, 289 (4th Cir. 2011) (citing *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992)).   "When the motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence."  *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).   Unlike a Rule 29 motion for judgment of acquittal, a Rule 33 motion does not require the court to view the evidence in the light most favorable to the government, and the court "may evaluate the credibility of the witnesses." *See id.*; *Campbell*, 977 F.2d at 860.   Ultimately, a new trial is required "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment."   *Arrington*, 757 F.2d at 1485 (citing *Tibbs v. Florida*, 457 U.S. 31, 38 n.11, 44 n.20 (1982)) (other citations omitted).   The discretion to grant a new trial is broad in nature, *see United States v. Prescott*, 221

F.3d 686, 688 (4th Cir. 2000), but it should be exercised sparingly.   *See, e.g.*, *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citation omitted).   The Fourth Circuit has provided that "if the evidence is legally sufficient to affirm a criminal conviction, a trial court abuses its discretion when, without further explanation, it grants 'a new trial based on its finding that the evidence was insufficient to support the verdict.'"   *Souder*, 436 F. App'x at 289 (quoting *United States v. Wood*, 340 F. App'x 910, 911 (4th Cir. 2009)).

## III.   DISCUSSION

### A.   Johnson's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial

Johnson's Motion for Judgment of Acquittal argues that the Government failed to provide sufficient evidence to establish guilt as to the charges in Counts One, Two, and Thirteen.   (ECF No. 775 at 5, 15.)   Alternatively, Johnson's motion argues for a new trial under Federal Rule of Criminal Procedure 33 because the jury was improperly instructed as to Hobbs Act conspiracy, a partial jury verdict was inappropriate, and the cumulative weight of the evidence did not support a judgment of guilt.   (*See id.* at 18–28.)

### 1.   Motion for Judgment of Acquittal as to Counts One and Two

Johnson first argues that the Government did not provide sufficient evidence that Johnson agreed with anyone to commit armed robberies of drug dealers because (1) he cannot be guilty simply by association; (2) there was no evidence that he was aware of the large-scale operation to commit armed robberies of drug dealers; and (3) no evidence showed that Johnson received drugs, money, firearms, or other proceeds from the conspiracy.   (*See id.* at 6–9.)   Further, Johnson argues that his acquittal as to the substantive Hobbs Act robberies charged in Counts Three and

Seven[1] preclude a finding of guilt as to Count One.  (*See id.* at 10–13.)  Lastly, Johnson avers that not only did the Government fail to prove one of the predicate offenses required for a finding of guilt as to Count Two, but also the Government failed to provide sufficient evidence that he agreed with anyone to use firearms in crimes of violence as required by Count Two.  (*See id.* at 14–15.)

The Government responds that the evidence of Johnson's guilt introduced at trial was "overwhelming," including testimony that established the following: "(1) defendant provided the name and location of the first victim, Leair Lipscomb ("Lipscomb"), as a drug dealer who would have a significant amount of marijuana and cocaine to rob; (2) defendant knew and agreed to use firearms during the commission of the robberies; and (3) that defendant told his co-conspirator that they did not get all of Mr. Lipscomb's drugs and should go back."  (*See* ECF No. 777 at 3–6 (citations omitted).)  Further, as to Count Two, the Government notes that Megan Smith testified as to Johnson's admission to shooting and therefore using a firearm during one of the robberies, and that her testimony was credited by the jury in their finding of guilt as to Count Thirteen related to witness tampering.  (*See id.* at 4.)

Count One of the Indictment charged Johnson with conspiracy to commit armed robbery in violation of 18 U.S.C. § 1951.  (ECF No. 418 at 1–6.)  To prove that charge, the Government had to prove the following three elements:[2]

---

[1]  While Johnson's motion argues that his acquittal on Counts Three and Five precludes a finding of guilty as to Count One, Johnson was not charged in Count Five of the Indictment.  (*See* ECF No. 418 at 10.)  Rather, he was charged on substantive Hobbs Act robberies in Counts Three and Seven.  (*See id.* at 8, 12.)  Accordingly, the Court will treat his argument as referencing Counts Three and Seven.

[2]  The Court is restating the elements as they were provided to the jury.  Neither Johnson nor Gillespie objected to the jury instructions at trial, (*see* ECF No. 769 at 87), and the Court does not find issue with them now.

8

| | |
|---|---|
| <u>First</u>: | That the defendant entered into an agreement with one or more persons to commit one or more robberies affecting interstate commerce, as charged in Count One of the Indictment;[3] |
| <u>Second</u>: | That the defendant had knowledge of that conspiracy; and |
| <u>Third</u>: | That the defendant knowingly and voluntarily participated in the conspiracy. |

(ECF No. 656 at 20.)   This count does not require any formal agreement or express statement of the agreement's purpose, details, or means of accomplishment.   (*Id.*)   The object of the conspiracy does not have to be successful, nor does a member of the conspiracy need knowledge of all available details.   (*Id.* at 20–21.)   A member becomes a knowing participant in the conspiracy when he, with understanding of the plan's unlawfulness, "knowingly encourages, advises or assists, for the purpose of furthering the undertaking or scheme."   (*Id.* at 21.)   While mere presence, mere similarity in conduct, or mere discussions of common aims and interests does not necessarily establish proof of a conspiracy, a member need not play a major role in the conspiracy to be convicted as a conspirator.   (*Id.*)

The Government need not prove a substantive offense violating the Hobbs Act to prove conspiracy to violate the Hobbs Act.   *See Callanan v. United States*, 364 U.S. 587, 589–90, 597 (1961); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir. 1978) (citations omitted). Consequently, a conspiracy is generally proven through circumstantial evidence and, indeed, "may be proved wholly by circumstantial evidence."   *United States v. Burgos*, 94 F.3d 849, 857–58 (4th Cir. 1996) (citations omitted).   No overt act is required in a conspiracy to commit Hobbs Act robbery.   *See United States v. Ocasio*, 750 F.3d 399, 409 n.12 (4th Cir. 2014).   Lastly, "[d]rug

---

[3] Johnson objects in his alternative Motion for New Trial that this element is improperly worded as far as it reads "one or more robberies," but for the reasons stated below in that part of the discussion, the Court does not agree and finds no error in the elements of Hobbs Act conspiracy as provided to the jury.

9

dealing is an inherently economic enterprise that affects interstate commerce." *See United States v. Taylor*, 754 F.3d 217, 222–23 (4th Cir. 2014) (citations omitted), *aff'd*, 136 S. Ct. 2074 (2016). Therefore, the act of robbing drug dealers threatens that enterprise and invokes federal jurisdiction under the Hobbs Act.

The testimony of Robert Barcliff ("Barcliff") established, first, that Johnson had a conversation with Barcliff and others about a general plan to rob drug dealers. (*See* ECF No. 631 at 10, 15.) Referring to his friendships with Johnson, Gillespie, Brandon Davis ("Davis"), and Keith Glenn ("Glenn"), Barcliff stated the following during the Government's direct examination of him:

> Q: At some point, did the nature of your friendship with these individuals change?
>
> A: Yes, it did.
>
> Q: How?
>
> A: We got involved in some other things, as far as our financial problems, so we came together and tried to come up with a come-up, as far as money.
>
> Q: What did you all decide to do to come together to make money?
>
> A: We decided to rob drug dealers.
>
> Q: How did the idea of robbing drug dealers come up?
>
> A: I'm not exactly sure, but what I do remember is having a conversation with Jamaa Johnson about it.

(*Id.* at 9–10.) This testimony goes toward showing that Johnson was part of a conversation where a general agreement was reached to rob drug dealers in an effort to remedy the group's individual financial troubles. Further, Barcliff provided the following testimony demonstrating that after the

first robbery in Pittsburgh in the fall of 2011, Johnson provided intelligence to Barcliff that would

advance the scheme outlined in the original conversation to which Johnson was a party:

> Q: After that particular robbery, did you have occasion to have a conversation
> with Defendant Johnson about a robbery?
>
> A: Yes.
>
> Q: What was that conversation about?
>
> A: The conversation was about that he had a -- he had some intel on a guy that
> lived in Welch, West Virginia that was a big-time drug dealer and we should
> go down there and rob him . . .
>
> Q: How was that victim identified?
>
> A: He was identified through Jamaa [Johnson], and he had -- Jamaa had went
> through a friend and he gave us the intel on him.
>
> Q: What did you expect the victim to have?
>
> A: At the time, we expected him to have cocaine, pills and marijuana.

(*See id.* at 15.)

Contrary to Johnson's characterization of this testimony in his motion, (*see* ECF No. 775

at 9), Barcliff specifically included Johnson as a party to these conversations regarding the general

scheme to rob drug dealers.   Moreover, Glenn testified that he was prompted to go to Welch, West

Virginia, in late 2011 for the purpose of robbing Lipscomb after Barcliff called and informed him

that Barcliff and Johnson "need[ed] some help with a robbery."   (*See* ECF No. 632 at 12.)

Johnson's willing participation in individual robberies that were part of the bigger conspiracy is

further evidenced by Davis' testimony regarding a robbery in the South Hills neighborhood of

Charleston.   (*See* ECF No. 683 at 30–31.)   *See also United States v. Leavis*, 853 F.2d 215, 218

(4th Cir. 1988) ("If a single conspiracy is proved, a defendant need not be involved in every phase

of that conspiracy to be deemed a participant.").  Davis testified that he called Johnson and told him they had a "lick,"[4] asked him if he wanted to be a part of it, he said yeah."  (ECF No. 683 at 30.  *See also* ECF No. 631 (Barcliff test.) ("Q: Who did you and Brandon Davis ask to help you with the robbery?   A: We asked Jamaa [Johnson] to help us . . . Q: Did he agree to come and help? A: Yes.").)   Despite Johnson's acquittal on the substantive offense of this robbery as detailed in Count Seven of the Indictment, this testimony goes toward showing that Johnson knowingly agreed to participate in the general conspiracy as well as certain acts meant to accomplish the conspiracy's end goals.

Viewing the evidence in the light most favorable to the Government, this testimony shows that Johnson knew the purpose of the scheme—acquiring money to fix the individuals' financial woes—and the means of accomplishing it—robbing drug dealers.  *See Burgos*, 94 F.3d at 857 (noting that the "gravamen of the crime of conspiracy is an *agreement* to effectuate a criminal act" (emphasis in original) (quoting *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir. 1980), *cert. denied*, 447 U.S. 925)).   Barcliff's testimony that Johnson gave him information about a known drug dealer in Welch and encouraged the group to "go down there and rob him," (*see* ECF No. 631 at 15), is further evidence that Johnson advised and assisted his co-conspirators in the scheme's advancement.   Proof that a robbery in Welch actually occurred, based on this intelligence, is unnecessary, precluding Johnson's argument that he cannot be found guilty on Count One because he was acquitted on the substantive Hobbs Act offenses in Counts Three and Seven.[5]  *See Callanan*, 364 U.S. at 589–90, 597 (providing that conspiracy to violate the Hobbs

---

[4] It was established early in the trial that "lick" is a word that the conspirators used to refer to robberies.  (*See* ECF No. 631 at 11; ECF No. 683 at 30.)

[5] Counts Three and Seven are not predicate offenses to Count One.   Nonetheless, as far as Johnson may be suggesting that the jury's finding of not guilty as to Counts Three and Seven necessarily means that the jury discredited all the

Act is a wholly separable offense from a substantive violation of the Hobbs Act); *Ocasio*, 750 F.3d at 409 n.12 (noting that no overt act is required to find a defendant guilty of conspiring to violate the Hobbs Act).   Proof of an agreement to commit the offense coupled with knowledge of the agreement and participation in it, even if the offense itself is thwarted, unsuccessful, or unproven, is all that is required.   Thus, the Court finds that sufficient evidence existed to find Johnson guilty as to Count One of the Indictment.

Johnson also argues that the partial verdict accepted by the Court should lead to acquittal as to Count One.   For the reasons stated below in the Court's discussion of Johnson's alternative Motion for New Trial on this point, accepting the partial jury verdict does not constitute an error requiring a reversal of Johnson's conviction on Count One.

Count Two of the Indictment charges Johnson with violating 18 U.S.C. § 924(o), which makes it a crime for anyone to conspire to commit offenses in violation of 18 U.S.C. § 924(c)—that is, to knowingly use and carry a firearm during and in relation to a crime of violence, including robberies affecting interstate commerce and conspiracy to commit such robberies in violation of 18 U.S.C. § 1951.   (ECF No. 656 at 24.)   This count requires proof of the following elements:

> First:    That the defendant entered into an agreement with one or more persons to commit the crime of knowingly using and carrying a firearm during and in relation to a crime of violence for which he could be prosecuted in a court of the United States, as charged in Count Two of the Indictment;
>
> Second:    That the defendant had knowledge of that conspiracy; and

---

evidence upon which it could find Johnson guilty as to Count One, "the actual rationale underlying the jury's verdicts (and lack thereof) are typically not the proper subject of judicial inquiry . . . ."   *United States v. Moore*, 763 F.3d 900, 913 (7th Cir. 2014) (citing Fed. R. Evid. 606(b); *Tanner v. United States*, 483 U.S. 107, 116–27 (1987); *Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir. 1993)).   Thus, a finding of guilt as to the conspiracy in Count One may be proper despite the jury's findings on the substantive counts.

> Third:        That the defendant knowingly and voluntarily participated in the conspiracy.

(*Id.*)  Authority both within and outside of the Fourth Circuit support the proposition that Hobbs Act robbery is a crime of violence.[6]

Expanding on Barcliff's general conversation with Johnson about the conspiracy to rob drug dealers, Barcliff stated at trial that he believed that using guns was understood between the two of them to be part of the agreement.  (*See* ECF No. 631 at 10 ("Q: Was it discussed about using guns?   A: I don't -- I'm not sure about that, but I believe we just understood that we would need a gun to rob a drug dealer.").)   Despite the jury's finding of not guilty as to Count Three of the Indictment relating to the November 2011 robbery in Switchback near Welch, both Barcliff and Glenn testified that weapons were taken with the group from Charleston to the target victim's house.  (*See* ECF No. 631 at 18–19; ECF No. 632 at 15.)   Barcliff stated that he was carrying a

---

[6] *See United States v. Anglin*, 846 F.3d 954, 964–65 (7th Cir. 2017) ("Hobbs Act robbery is a 'crime of violence' within the meaning of § 924(c)(3)(A).   In so holding, we join the unbroken consensus of other circuits to have resolved this question." (citing *United States v. Hill*, 832 F.3d 135, 140–44 (2d Cir. 2016); *In re St. Fleur*, 824 F.3d 1337, 1340 (11th Cir. 2016); *United States v. Howard*, 650 F. App'x 466, 468 (9th Cir. 2016))); *Hill*, 832 F.3d at 140–45 (holding that Hobbs act robbery qualifies categorically as a crime of violence under both the force clause and residual clause of § 924(c)(3)); *see also United States v. Sehorn*, No. 16cv1573 WQH, 2017 WL 1336872, at *5–6 (S.D. Cal. Feb. 17, 2017) (denying the petitioner's § 2255 motion and finding that Hobbs Act robbery is a crime of violence under both the force and residual clauses of § 924(c)); *United States v. Hernandez*, No. 2:16–cr–39–NT, 2017 WL 111730, at *4–5 & n.6 (D. Me. Jan. 11, 2017) (finding that Hobbs Act robbery is categorically a crime of violence under the force clause and citing four circuit court cases and twenty-five district court cases that concluded similarly); *United States v. Tyree*, No. 3:16CR00022, 2016 WL 7441715, at *4 (W.D. Va. Dec. 23, 2016) (denying the defendants' motion to dismiss certain counts of the superseding indictment on the premise that "Hobbs Act robbery is categorically a crime of violence under § 924(c)(3)'s force clause"); *Harkum v. United States*, No. 1:16CV123, 2016 WL 5137417, at *2–4 (N.D. W.Va. Sept. 21, 2016) (citing *Hill*, 832 F.3d at 139–41) (denying the petitioner's § 2255 motion and agreeing with a recent Second Circuit case holding that "Hobbs Act robbery is a 'crime of violence' under the force clause"), *appeal docketed*, No. 16-7536 (4th Cir. Nov. 3, 2016) (appeal placed in abeyance pending Supreme Court's decision in *Dimaya v. Lynch*, 85 U.S.L.W. 3114 (U.S. Sept. 29, 2016) (No. 15–1498)); *United States v. Reed*, 187 F. Supp. 3d 743, 748–49 (W.D. La. 2016) (finding that "Hobbs Act robbery falls within the force clause of § 924(c)"); *United States v. Standberry*, 139 F. Supp. 3d 734, 740–41 (E.D. Va. 2015) (denying the defendants' motions to dismiss certain counts of the superseding indictment, joining other courts in holding that Hobbs Act robbery is categorically a crime of violence under the force clause, and noting that even if the modified categorical approach were applied, the allegations in the superseding indictment were "more than adequate to satisfy the definition of 'crime of violence' contained in § 924(c)(3)(A)").

14

firearm, and when asked if Johnson and Glenn were aware of the gun, Barcliff responded affirmatively because he "showed it in the car."   (ECF No. 631 at 18–19.)   Glenn also testified that Barcliff had a weapon and that all the participants knew about the weapon.   (*See* ECF No. 632 at 15 ("Q: Who had weapons with them?   A: Robert Barcliff had a weapon.   Q: And did you all know that he had a weapon?   A: Yes, sir.   Q: Did everybody know he had a weapon?   A: I would assume that, yes.   Q: And how would you assume that?   A: Because he had it out in the car.").)   This goes toward showing Johnson's participation in the conspiracy to use firearms in connection with the conspiracy to commit armed robberies.   *See United States v. Roberts*, 881 F.2d 95, 101 (4th Cir. 1989) (noting that a defendant may be guilty of conspiracy "without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part").

Further, despite Johnson's acquittal on Count Seven of the Indictment involving the South Hills robbery,[7] Davis testified that Johnson brought a firearm from Wytheville, Virginia, to Charleston to use in that robbery on January 18, 2012.   (*See* ECF No. 683 at 31 ("Q: Did you bring your firearm?   Did you bring a firearm to Charleston from Wyth[e]ville?   A: Yes.   Q: Did

---

[7] The Court does not agree with Johnson that a finding of not guilty as to the substantive Hobbs Act robberies necessarily implies that the jury "whole-heartedly rejected" all testimony and evidence associated with those crimes. (*See* ECF No. 775 at 14–15.)   *See also United States v. Powell*, 469 U.S. 57, 65 (1984) ("[I]nconsistent verdicts— even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense.").   The beyond a reasonable doubt standard provides that "each 'element of a crime' must be submitted to a jury and proved beyond a reasonable doubt."   *United States v. Ward*, 770 F.3d 1090, 1097 (4th Cir. 2014) (citing *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).   The inability to find that every element of a crime has been proven beyond a reasonable doubt is not the same as rejecting every piece of evidence used by the Government in its attempt to prove those elements.   Again, a jury's rationale is not available for judicial scrutiny.   *See Moore*, 763 F.3d at 913 (citing Fed. R. Evid. 606(b)) (citation omitted).

Defendant Johnson?  A: Yes.  Q: How do you know?  A: Seen it.  Q: In the vehicle?  A: Uh-huh.").)  In support of the fact that Johnson carried a firearm during that incident, Megan Smith testified that she drove Johnson from Wytheville back to Charleston on the night of January 18, 2012, and he told her in the car that he shot someone when he, Barcliff, and Davis "went to somebody's house to rob them" for money or drugs.  (*See* ECF No. 635 at 159–62, 167 ("He said that the guy was coming downstairs to kill him and that he didn't have another way out, so his story to me was, 'I shot him in the leg so I could get out of the house.'").)

While Johnson argues that "no other evidence" than these testimonial statements prove that Johnson conspired to carry a firearm or actually did carry a firearm, there is no threshold level that the evidence must satisfy as long as the three elements of the crime are sufficiently supported. *See Burgos*, 94 F.3d at 857 ("By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement.").  The Court finds after viewing the evidence in the light most favorable to the Government that, contrary to Johnson's suggestion, no more evidence is required.  The Court already found that sufficient evidence existed for a finding of guilt as to Count One, and sufficient evidence also existed to find Johnson guilty as to Count Two of the Indictment.

### 2.  Motion for Judgment of Acquittal as to Count Thirteen

Count Thirteen charged Johnson with witness tampering.[8]  (ECF No. 418 at 19.)  The jury in this case was instructed, after no objection by the parties, (*see* ECF No. 769 at 87), that to

---

[8] The Indictment provides the alternative charge for Count Thirteen of attempted witness tampering.  (ECF No. 418 at 19.)  However, the jury found him guilty of the substantive act, (ECF No. 618 at 7 (Question 24)), so the Court will not address the attempt charge.

convict Johnson of Count Thirteen, the United States must prove each of the following two elements beyond a reasonable doubt:

> First:        The defendant knowingly engaged in conduct to corruptly persuade another, or attempted to do so; and

> Second:   The defendant acted knowingly and with the intent to influence the testimony of another in an official proceeding.

(ECF No. 656 at 36.)    While the Government was not required to prove that Johnson knew he was breaking any criminal law, it must have shown that Johnson acted "knowingly with a wrongful, immoral, depraved, or evil purpose to convince or induce another person to engage in certain conduct" and with knowledge that a federal proceeding was foreseeable at the time he engaged in the conduct.   (*Id.* at 36–37.)    Of importance, the Government did not need to prove that the testimony of the person subject to the persuasion was actually changed.   (*Id.* at 37.)   *See United States v. Wilson*, 796 F.2d 55, 57 (4th Cir. 1986) (citation omitted) ("The success of an attempt or possibility thereof is irrelevant; [§ 1512(b)(1)] makes the endeavor a crime.").

Johnson's motion argues that the Government failed to prove that he "attempted to corruptly persuade Megan Smith to provide a false alibi for him in an official proceeding."   (*See* ECF No. 775 at 15.)   First, Johnson claims that the Government did not provide sufficient evidence showing that Johnson knowingly and corruptly persuaded or attempted to persuade the witness to provide a false alibi for his whereabouts on January 18, 2012, the day of the robbery that is the subject of Count Seven of the Indictment, because the jury found Johnson not guilty of the substantive crime alleged to have occurred on that day.   (*See id.* at 17.)   Thus, according to Johnson, "the government also failed to prove that Mr. Johnson's discussions with Megan Smith regarding his whereabouts on that day were 'corrupt' or 'false.'"   (*Id.*)   Secondly, Johnson argues

17

that the Government did not provide "even a scintilla of evidence" to support this charge "because Megan Smith testified that she never provided an alibi for Mr. Johnson, Mr. Johnson never told her he was identifying her as a witness in any trial or any other official proceeding, and the government had not even contacted her yet."  (*Id.*)

The Government argues that there was sufficient evidence at trial to establish Count Thirteen, including testimony from Megan Smith concerning her involvement with Johnson "to help him cover up his role in the conspiracies," her admissions to lying to Federal Bureau of Investigation ("FBI") agents on February 18, 2014, and her assistance to Johnson on the evening of January 18, 2012, to cover-up his role in the robbery.  (*See* ECF No. 777 at 4–5 (citation omitted).)  Further, the Government cites evidence of a letter admitted at trial sent by Johnson to Smith that she interpreted as asking her to provide him with a false alibi.  (*See id.* at 6.)

Megan Smith provided testimony at trial as to her relationship and involvement with Johnson.  She testified that after an incident that took place in Charleston on January 18, 2012, Johnson went back to Winston Salem, North Carolina, with Smith and lived with her at her house for "[s]everal months."  (*See* ECF No. 635 at 164–65.)  While he supposedly moved out in either March or April of 2012, Smith heard that Johnson was facing federal charges and "wrote him a letter three or four months after he initially got incarcerated."  (*See id.* at 165.)  In response to that letter, Johnson began calling Smith while he was incarcerated.  (*See id.* at 166.)

Initially, the Government asked Smith about a telephone conversation she had with Johnson on February 8, 2014.  (ECF No. 755 at 4.)  After playing an audio recording of the conversation in open court, the Government asked her what she understood Johnson to be talking about.  (*Id.* at 10.)  Smith responded, "Where -- where he was that night, where he wanted me to

say he was" on January 18, 2012.  (*Id.* at 10–11.)  She answered affirmatively when asked, "And did he want you to be his alibi for the daytime of January 18th, 2012?"  (*Id.* at 13.)  Further, she responded "no" when asked, "Was what he was asking you to do the truth?"  (*Id.*)  Smith was later questioned about a telephone conversation from December 13, 2014.  (*Id.* at 14.)  After listening to the call and identifying the speakers as herself and Johnson, Smith testified as to Johnson's desire for her to discuss the alibi with a man named Jesse Stewart ("Bro"), which she said she did.  (*Id.* at 15–16, 18.)

Smith testified that she and Johnson initially discussed a letter that Johnson was going to send her.  (*See id.* at 4.)  She received such a letter, (*see* ECF No. 678-13 (Gov't Ex. 75) (Johnson's handwritten letter to Smith)), and the Government asked her to read a portion of the letter about the alibi Johnson wished Smith to provide.  (*See* ECF No. 755 at 21–22.)  The following is the portion of the letter that Smith read in open court:

> Megan, hey.  This letter won't be long.  I need you to really remember that trip you took to see me at Bro's.  I know you remember.  Bro picked me up Sunday after church.  We talked on the phone that day, remember?  I told you we were on our way.
>
> Bro got tickets to the VCU game that Thursday, so I was going to take a vacation for the week.  We hadn't got to see each other in so long because of Cindy, so you told me you would come visit me there and get a room, but Bro told me that you could stay at the house, we just had to bring an air mattress.
>
> I remember you got up there from Winston around 2:00 that Tuesday.  We hung out at the house all that day.  We went to some bar around 11:00 that night, just me and you.  Bro didn't want to go with us.
>
> The next day, we woke up late and had lunch and we checked out the city.  You knew we were going to the game the next day, so you left about 6:30–7:00, maybe, that Wednesday night.

I remember talking to you Thursday, as well. Me and Bro sit [sic] around and waited and had some drinks and ended up waiting too late to go to the game. I called you late mad because we missed a great game.

VCU went into overtime. I think the final score was 68 to 69. We ended up just going to the bar, me and Bro. Then, you got a call from me Saturday.

. . .

I know you remember this. If so, I'm going to need you. My situation boils down to you, Bro and Cindy remembering, but I know you will. We had a good time.

(*Id.*) When asked, "Is any of that true?" Smith replied, "No." (*Id.* at 22. *See also id.* at 24 ("Q: Was anything he asked you to testify about true? A: No.").) At the end of the letter, Johnson asked Smith again to get in touch with Bro by either letter or e-mail to discredit what Barcliff and Davis were telling law enforcement. (*See id.* at 23–24.) He wrote, "It's just me and [Gillespie] left. We are going to trial." (*Id.* at 24.)

Viewing the evidence in the light most favorable to the Government, the Court finds that this testimony shows that Johnson engaged in conduct to corruptly persuade Megan Smith to provide a false alibi for his whereabouts on January 18, 2012. He wrote her a letter trying to get her to "remember" being with him and called her while incarcerated on multiple occasions to ensure that she was carrying out the requests he made in the letter. Further, Smith stated multiple times that no details of their alleged time together that day were true. (*See id.* at 22, 24.) The Court also finds that at the time he wrote the letter and talked to Smith on the telephone, Johnson acted with knowledge that an official proceeding in this matter was inevitable and with intent to influence Smith's testimony. (*See id.* at 112 ("Q: Was Defendant Johnson relying on the fact that you were his ex-girlfriend to strengthen his alibi? Did he discuss with you that you were his ex-girlfriend coming to testify for him? A: Yes.").) He stated at the end of the letter that he and

Gillespie were going to trial, and this provides, at minimum, a reasonable inference about an impending proceeding.   Additionally, because he recognized that his "situation boil[ed] down to" Ms. Smith, Johnson had knowledge that she was a likely witness in this proceeding.   (*See id.* at 24; *see also id.* at 121 ("Q: During your phone conversations with Defendant Johnson, did he instruct you not to talk about the alibi on the jail phones?   A: Yes."); ECF No. 760 at 19 (Mallet test.) (noting that the FBI became aware of Megan Smith's identity as a potential witness during Special Agent Mallet's interview of Davis on February 7, 2014).)   The Government did not need to prove that Ms. Smith actually testified falsely because of Johnson's inducement.   *See Wilson*, 796 F.2d at 57.   For these reasons, the Court finds that sufficient evidence was presented at trial to sustain a conviction on Count Thirteen of the Indictment, and a judgment of acquittal is inappropriate on this charge.

      3.   <u>Motion for New Trial Based on Improper Jury Instructions as to Hobbs Act Conspiracy</u>

      Johnson alternatively argues that the Court should grant him a new trial under Federal Rule of Criminal Procedure 33.   First, this alternative motion is premised on an argument that the jury instructions constructively amended the Indictment as to the Hobbs Act conspiracy for the following reasons: (1) it allowed the jury to find Johnson guilty of the overarching conspiracy if it found he conspired to commit a single robbery; (2) it did not provide the time frame for the conspiracy; and (3) it did not specifically state that evidence of witness tampering could not be a basis for guilt in the conspiracy.   (*See* ECF No. 775 at 18–19.)   Moreover, Johnson argues that the jury instructions were improper for omitting an overt act requirement and stating that the robbery of a drug dealer inherently affects interstate commerce without allowing the jury to decide that matter for itself.   (*See id.*)

The Government responds that the Indictment was not constructively amended when the Court issued the jury instructions.  (*See* ECF No. 777 at 9–10.)   The Government cites the Indictment, which charges Johnson and Gillespie in Count One with conspiring to interfere with interstate commerce "by robbery."  (*See id.* at 11.)   Thus, according to the Government, the instruction notifying the jury that Johnson and Gillespie could be convicted of Hobbs Act conspiracy if they conspired to interfere with interstate commerce by means of a single robbery does not vary the Indictment's charge.  (*See id.* at 11.)   Further, the Government argues that the jury instructions defined the conspiracy's time frame, properly advised the jury that an overt act was not required, and accurately stated the Fourth Circuit's stance that drug dealing affects interstate commerce as a matter of law.  (*See id.* at 15–16.)

"A constructive amendment to an indictment occurs when . . . the court (usually through its instructions to the jury) . . . broadens the possible bases for conviction beyond those presented by the grand jury, which results in a fatal variance [ ] because the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment."   *United States v. Holmes*, 376 F. App'x 346, 348 (4th Cir. 2010) (quoting *United States v. Foster*, 507 F.3d 233, 242 (4th Cir. 2007) (internal quotation marks and citation omitted)).   The grand jury must have indicted for the crime actually proved.  *See United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010) (holding that "a district court does not constructively amend an indictment by giving a *Pinkerton* instruction when *Pinkerton* liability has not been charged by the grand jury").   Constructive amendments result in an error per se and "must be corrected on appeal even when not preserved by objection."   *See United States v. Floresca*, 38 F.3d 706, 714 (4th Cir. 1994) (en banc); *United States v. Rendelman*, 641 F.3d 36,

43 (4th Cir. 2011). The Court notes that "not every variance between an indictment and jury instructions rises to the level of a constructive amendment." *Holmes*, 376 F. App'x at 348 (citing *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009) (explaining that instructing the jury in the disjunctive, reflecting the statute's disjunctive wording, when the indictment charges in the conjunctive does not constructively amend the indictment), *cert. denied*, 558 U.S. 866).

With regard to conspiracy to commit Hobbs Act robbery, a district court must instruct the jury as to the proper elements encompassing both Hobbs Act robbery and conspiracy. *See United States v. Johnson*, 600 F. App'x 872, 876 (4th Cir. 2015) (holding that jury instructions were erroneous with respect to the Hobbs Act conspiracy counts because "the district court failed to give an instruction that included the elements of conspiracy"). Courts should provide instructions that accurately track the following language the Fourth Circuit has cited approvingly: "to prove a Hobbs Act conspiracy, the government must show three things, namely that '(1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal.'" *United States v. Carr*, 261 F. App'x 560, 563 (4th Cir. 2008) (quoting *United States v. To*, 144 F.3d 737, 747–48 (11th Cir. 1998)).

As stated above, the Fourth Circuit has held that no overt act is required in a conspiracy to commit Hobbs Act robbery, *see Ocasio*, 750 F.3d at 409 n.12, and that drug dealing is an inherently economic enterprise affecting interstate commerce for purposes of the Hobbs Act, *see Taylor*, 754 F.3d at 222–23; *see also United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003) ("Drug dealing, to repeat, is an inherently economic enterprise that affects interstate commerce. For this reason, the robbery of a drug dealer has been found to be the kind of act which satisfies the

23

'affecting commerce' element of the Hobbs Act, inasmuch as such a robbery depletes the business assets of the drug dealer." (citations omitted)).  Further, "[t]he beginning and ending dates of a conspiracy are not elements of that offense," so not setting out a time frame for the conspiracy within the jury instructions would not be grounds for a new trial.  *See United States v. Kilgore*, 401 F. App'x 842, 844 (4th Cir. 2010) (citations omitted) (providing that "proof of different dates could never raise the specter of conviction for a different crime").

Here, the jury instructions accurately provided three elements reflecting the elements cited approvingly by the Fourth Circuit in *Carr*.[9]  *See* 261 F. App'x at 563.  To constitute a constructive amendment to the Indictment, the Court would have to have provided elements that allowed the jury to convict Johnson of a crime with which he was not charged in the Indictment.  *See Holmes*, 376 F. App'x at 348.  Regardless of whether the Indictment uses the word "robberies" while the jury charge uses the phrase "one or more robberies," both precisely reflect the requirements of a Hobbs Act conspiracy.  *See Carr*, 261 F. App'x at 563.  Nevertheless, the Indictment states in its explanation of the conspiracy contained in Count One that "defendants Jamaa I. Johnson and Darrell E. Gillespie knowingly conspired with each other, and with others known and unknown to the Grand Jury, to obstruct, delay, and affect interstate commerce, and the movement of articles and commodities in interstate commerce, *by robbery . . . .*"  (ECF No. 418 at 2 (emphasis added).)  The context of the word "robberies" referenced by Johnson is within a section of Count One entitled "Manner and Means of the Conspiracy."  (*See id.*)  This is an

---

[9] *Compare Carr*, 261 F. App'x at 563 (providing the three elements as: "(1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal"), *with* ECF No. 656 at 20 (providing the three elements as: "First: That the defendant entered into an agreement with one or more persons to commit one or more robberies affecting interstate commerce, as charged in Count One of the Indictment; Second: That the defendant had knowledge of that conspiracy; and Third: That the defendant knowingly and voluntarily participated in the conspiracy").

explanation of the charge and not the charge itself.   Thus, the Court's instruction to the jury that it may convict Johnson of Hobbs Act conspiracy if it finds beyond a reasonable doubt that he knowingly and intentionally conspired to commit one or more robberies still properly instructs the jury on the charge of Hobbs Act conspiracy.   Nothing about the wording of the instructions broadens the scope of the crime as to allow the jury to find him guilty of a crime not charged within the Indictment.

Moreover, the Court was not required to instruct the jury as to the specific dates of the conspiracy because beginning and end dates to a conspiracy are not elements of the charge.   *See Kilgore*, 401 F. App'x at 844.   As the Government points out, however, the Court referenced the various time frames in the Indictment in the Court's general instructions and instructed the jury that "[i]t is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged."   (ECF No. 656 at 44.) There is no error in this instruction.

The Court also does not find merit in Johnson's conclusory statement that "it cannot be said that Mr. Johnson's conviction on Count One did not result from the consideration of improper evidence" because he was acquitted of the substantive gun and robbery counts but convicted of witness tampering.   (*See* ECF No. 21.)   The jury heard all the evidence presented at trial and was properly instructed as to Count One, and the Court is not in the business of attempting to decipher exactly what weight the jury gave to the various pieces of evidence.   It is illogical to presume that the jury could not find Johnson guilty of the conspiracy charged in Count One without finding him guilty of the substantive offenses underlying the conspiracy.   Lastly, the Court acted properly in instructing the jury that drug dealing is an inherently economic enterprise affecting interstate

25

commerce, *see Taylor*, 754 F.3d at 222–23, and it acted just as properly in not instructing the jury as to a requirement of an overt act,[10] *see Ocasio*, 750 F.3d at 409 n.12.   Ultimately, the jury still had to decide for itself that Johnson knowingly and intentionally reached an agreement to rob drug dealers in violation of the Hobbs Act.

  4. <u>Motion for New Trial Based on Partial Jury Verdict</u>

  Johnson claims that "the court prematurely pierced into the jury's deliberations resulting in prejudice . . . ."   (*See* ECF No. 775 at 24.)   He argues that the Court intruded on the jury's deliberations because the only way the jury "would have noticed the multiple inconsistencies in their verdict and corrected them on their own" is if the jury was unsure whether it could continue deliberating on the entire Indictment or only on the specific questions instructed by the Court.   (*See id.* at 24–25.)   The Government responds that Federal Rule of Criminal Procedure 31(b)(1)–(2) allows the jury to return this type of partial verdict.   (*See* ECF No. 777 at 8.)   Further, the Government notes that the Court did not coerce the jury into providing any part of its verdict and did not even inquire as to whether the jury had reached a verdict.   (*Id.* (citing *United States v. Powell*, 469 U.S. 57, 65 (1984)).)

---

[10] In support of his argument that Hobbs Act conspiracy requires the finding of an overt act in furtherance of the overarching conspiracy, Johnson cites *United States v. Strayhorn*, 743 F.3d 917, 925 (4th Cir. 2014).   However, that case does not appear to support his proposition.   There, the Fourth Circuit states the following with regard to the defendant's Hobbs Act conspiracy conviction:   "To prove a Hobbs Act conspiracy, the government must prove that the defendant agreed with at least one other person to commit acts that would satisfy the following three elements:

   (1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the wrongful use of actual or threatened force, violence or fear or under color of official right; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce."

*Id.* (quoting *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990)).   While the Fourth Circuit noted that the defendant in that case "took steps to carry out the robbery," the court never pronounced a rule or requirement that those steps were necessary for the Hobbs Act conspiracy to be proved.   *See id.*

Federal Rule of Criminal Procedure 31 allows for the return of a jury's verdict as to less than all defendants or less than all counts.   Fed. R. Crim. P. 31(b).   Federal courts have affirmed the right to receive and publish partial jury verdicts, and the practice of taking a partial verdict is not per se invalid.   *See United States v. Taylor*, 19 F. App'x 62, 65 (4th Cir. 2001); *United States v. Benedict*, 95 F.3d 17, 19 (8th Cir. 1996); *United States v. DiLapi*, 651 F.2d 140, 146–47 (2d Cir. 1981), *cert. denied*, 455 U.S. 938 (1982).   While the jury should be instructed as to their options to report a partial verdict or defer the report of a verdict until deliberations are concluded, the absence of such an explanation "where the jury neither attempted to return a partial verdict nor even asked if it could do so," does not deny defendants any protected right.   *See DiLapi*, 651 F.2d at 147.   "Whether and when to advise the jury that it may return a partial verdict as the rule permits, and at what point during deliberations it is appropriate for the court to accept a partial verdict, are necessarily discretionary and fact-dependent decisions."   *United States v. Moore*, 763 F.3d 900, 910–11 (7th Cir. 2014) (citing cases from the Sixth, Seventh, Eighth, and Tenth Circuits).   The court may not coerce the jury into deciding a verdict if it notes its inability to agree. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965).   Thus, the Court may accept a partial verdict before requiring the jury to resume deliberations on those matters yet to be decided.   *See United States v. McKinney*, 822 F.2d 946, 950 (10th Cir. 1987) (citing *United States v. Ross*, 626 F.2d 77 (9th Cir. 1980)); *United States v. Barash*, 412 F.2d 26, 31–32 (2d Cir. 1969).

After the close of evidence on the tenth day of trial, the Court instructed the jury on the applicable law and the verdict form they were to complete.   (ECF No. 769 at 29–87.)   The jury deliberated for approximately an hour on January 27, 2015, before being excused for the evening. (*Id.* at 88–90.)   On January 28, 2015, the jury informed the Court that it had reached a unanimous

verdict.  (ECF No. 727 at 2.)   The Court reviewed the verdict form and discovered that it was incomplete as to a few questions.  (*Id.* at 3.)   Based on the foreperson's representation that a unanimous verdict was reached, the Court published the verdict form as it stood before excusing the jury from open court.  (*Id.* at 6–13.)   The Court and counsel for all parties agreed that "the jury should have answered Question 8, Question 16, and Question 21 and, depending on their answer to Question 21, Question 23."  (*Id.* at 13.)   The Court brought the jury back to open court and read the following instruction:

> Ladies and gentlemen, it appears that there are questions on the verdict form that we need an answer -- that we need you to answer that were not.   Therefore, I will ask you to return to your deliberations and please answer Questions 8, 16, and 21. Depending on your answer to Question 21, you may also need to answer Question 23.

(*Id.* at 20.)

Upon further deliberation, the jury sent a note to the Court signed by the foreperson that read, "We have questions about some questions that need clarifications."  (*Id.* at 22.)   The Court responded with a note that said, "What are your questions?"  (*Id.*)   The jury replied with the following: "Can we change a verdict for numbers 7 and 15?   Upon review, misunderstood the wording of the questions after reviewing 8 and 16 upon your request.   If not, please advise."  (*Id.*) Under no objection by the parties, the Court wrote a note back that stated, "You may do so."  (*Id.* at 24.)   Later that afternoon on January 28, 2015, the jury advised the Court of the following: "We re-read all questions, discussed.   Made those few adjustments.   Feel confident in our decisions. [Foreperson] Terri Damon."  (*Id.* at 25; ECF No. 667.)   The Court proceeded to read the twenty-seven questions and answers listed in the verdict form in their entirety before polling the jury. (ECF No. 727 at 26–35.)

While he did not object to the further instruction given to the jury, Johnson expressed concern to the Court that Questions 8 and 16 may have been left blank because the jury intended to enter a not guilty verdict to Questions 7 and 15, which would make the guilty verdicts actually entered to Questions 7 and 15 inaccurate.  (ECF No. 777 at 14.)  Alternatively, Gillespie's counsel proposed that the "responses to Questions 7 and 15 might not be unanimous."  (*Id.* at 15.) If either of those was true, Gillespie argued, then "asking them to deliberate further on Questions 8 and 16 [ ] may actually be interfering with the deliberations of the jury."  (*Id.*)  The Court responded that it did not have "any evidence of a lack of unanimity and, in fact, [it had] evidence of unanimity as to the verdict . . . in the comment of the foreperson."  (*Id.* at 16.)

Consistent with the Court's decision at trial, it was proper for the Court to publish a partial verdict as to those counts on which the jury reached a unanimous verdict and to require them to deliberate further on the counts upon which they had not decided.  *See McKinney*, 822 F.2d at 950; Fed. R. Crim. P. 31(b)(2).  The Court read the verdict as it stood in open court and worked with counsel to draft further instruction as to how the jury should proceed with the questions that should have been answered.  (*See* ECF No. 727 at 19–20.)  As the Government notes, if any error was committed when the jury changed the answers to questions relating to Counts Four and Eight of the Indictment, it was in Johnson's favor.  (*See* ECF No. 777 at 19 n.3; *see also* ECF No. 658 at 2–3, 5 (Questions 7 and 15).)  The Court's actions were within its discretion, and the interests of justice do not require a new trial on this ground.  *See Perry*, 335 F.3d at 320.

5. <u>Motion for New Trial Due to Insufficient Evidence</u>

Finally, Johnson argues that "[t]he jury's verdicts as to Counts One and Two were against the cumulative weight of the evidence because the testimony and evidence presented by the government was contradictory and lacked credibility." (ECF No. 775 at 25.) Johnson claims that Barcliff, Glenn, Davis, and Smith, who all testified for the Government at trial, gave self-serving testimony that was "widely inconsistent and improbable." (*Id.*) The Government responds that the evidence clearly supported the verdict and that it "included not only the testimony of co-defendants, co-conspirators, and victims, but also defendant's recorded jail calls and defendant's phone records." (ECF No. 777 at 20.)

To grant a motion for new trial based on insufficient evidence, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985) ("Motions for new trials based on weight of the evidence are not favored."). *See also United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991). The Court is not required to view the evidence in the light most favorable to the government, and it may weigh evidence and determine witnesses' credibility itself. *See Souder*, 436 F. App'x at 289. A new trial may be warranted where witness testimony is "overwhelmingly inconsistent and unreliable" such that it is clear that the witnesses tried "to game the system." *See United States v. Stallworth*, 466 F. App'x 218, 223–24 (4th Cir. 2012). However, "[a]lthough the decision to grant a new trial lies within the discretion of the district court, respect for the role of the jury demands that a court exercise this discretion 'sparingly.'" *Souder*, 436 F. App'x at 289 (citing *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006)).

Johnson argues in his motion specific instances where testimony was allegedly contradictory.   First, Johnson argues that Barcliff's testimony was inconsistent where he claimed under direct examination that Johnson identified Lipscomb as a potential robbery victim but then admitted under cross-examination that the information actually came from a man named "Houston."   (ECF No. 775 at 25.)   The Court does not interpret these statements, in context, as contradictory.   On direct examination, Barcliff testified that Lipscomb "was identified through Jamaa [Johnson], and he had -- Jamaa had went through a friend and he gave us the intel on him." (ECF No. 631 at 15.)   On cross-examination, the following exchange occurred: "Q: With regard to that Switchback incident, do you remember where you got the information about Switchback from?   A: Yes.   Q: Where did you get it from?   A: I got it from Jamaa [Johnson].   Q: Where did -- where did Jamaa say he got the information from?   A: I believe a friend."   (ECF No. 682 at 135–36.)   Ultimately, the information still came to Barcliff through Johnson, and Barcliff stated both times that Johnson got the intelligence through another person.   (*Compare* ECF No. 631 at 15, *with* ECF No. 682 at 135–36.)   While there may be some inconsistency in Barcliff's testimony as to how well Barcliff knew Johnson's friend "Houston," (*see* ECF No. 682 at 136–40, 150), the Court does not find that this amounts to perjury, nor is this inconsistency directly related to the elements of the crime the Government was required to prove.

Johnson also attacks the testimonies of Barcliff and Davis as to Johnson's role in the South Hills robbery of Cabell Franklin.   (*See* ECF No. 775 at 26–27.)   While it is the case that Barcliff and Davis differed in how they described the details of the plan, (*compare* ECF No. 631 at 40 (Barcliff test.) (noting that "the plan was for Brandon [Davis] to ring the doorbell and Jamaa [Johnson] was to put the victim at gunpoint and walk him back in the house"), *with* ECF No. 683

at 24 (Davis test.) (describing that the participants were "going to get Jamaa [Johnson] to knock and kind of grab [Franklin] up, and [Davis] and Robert [Barcliff] was going to grab him up and Jamaa to zip-tie him")), they do not differ in their explanation of the agreement to rob Cabell Franklin, a person they both thought had a lot of marijuana.   (*See* ECF No. 631 at 35; ECF No. 683 at 30–31.)   Again, while there may be slight inconsistencies with the details described, the overarching conspiracy described by the two witnesses is not contradictory, and differing statements as to who was supposed to enter Franklin's residence first does not negate the evidence in support of a finding of a Hobbs Act conspiracy.

Lastly, Johnson claims that the testimony of Deangelo Cann "casts doubt on the government's cooperating witnesses" because Cann testified that while he was incarcerated with Barcliff, he heard Barcliff bragging about committing the South Hills robbery of Cabell Franklin with Glenn, William Seltzer, and Jared Smith.   (ECF No. 775 at 27.)   Cann's answer, which named these conspirators, was in response to an open-ended question about whom Barcliff mentioned as committing the robbery with him.   (ECF No. 760 at 156 ("Would you briefly tell the ladies and gentlemen of the jury . . . who it was that Mr. Robert Barcliff claimed he used or joined in with to rob Cabell Franklin, the drug dealer?").)   Counsel did not explicitly ask Cann if Johnson was mentioned, so Cann never had a chance to affirm or deny on the stand whether he had knowledge about Johnson's specific participation in that robbery.   This does not contradict the evidence supporting the overarching conspiracy.   If anything, it is evidence that Johnson did not actually participate in the South Hills robbery, which may well be reflected in Johnson's acquittal as to that substantive offense.

32

The Court reincorporates its discussion from Johnson's motion for judgment of acquittal regarding Counts One and Two and reaffirms its earlier finding that the evidence presented at trial was sufficient to convict Johnson as to these counts.   To grant a new trial in the face of all the evidence presented at trial would constitute an abuse of the Court's discretion.   *See Souder*, 436 F. App'x at 289.   The various witness' testimony, even taking into account minor inconsistencies, is still plausible and convincing to support the verdict as to Counts One and Two.   *See United States v. Cabrera*, 734 F. Supp. 2d 66, 89–90 (D.D.C. 2010), *aff'd*, 826 F.3d 514 (2016), *petition for cert. docketed*, No. 16-7775 (U.S. Feb. 3, 2017).   Thus, Johnson's motion cannot survive on this final ground.

### B.   *Gillespie's Motion for New Trial*

Gillespie's Motion for New Trial is based on three rulings that the Court made during trial and two additional grounds related to the sufficiency of the evidence.   (*See* ECF No. 765.)   The Court reviews the current motion under the Rule 33 standard governing a motion for new trial regardless of whether the arguments contained therein allude to a different standard.   For example, while the motion's second ground is based on the Court's ruling at trial on Gillespie's motion for judgment of acquittal as to Count Fourteen pursuant to Federal Rule of Criminal Procedure 29, a review of that ruling will be conducted under Rule 33.

### 1.   Motion for Mistrial as to Question 21 of Jury Form

First, Gillespie's motion is based on "[t]he Defendant's motion for a mistrial made orally during the discussion between the Court and counsel after the return of the jury's first version of its verdict on Day 11 of the trial, January 28, 2015."   (*Id.* at 1.)   At trial, Gillespie moved "for a mistrial as to . . . how the jury dealt with Question 21."   (ECF No. 727 at 18.)   The Government

responds that the Court properly denied the oral motion at trial because "when there are multiple defendants, the jury may return a verdict at any time during its deliberations as to any defendant about whom it has agreed . . . [I]f the jury cannot agree on all counts as to any defendant, it may return a verdict on the counts on which it has agreed."  (ECF No. 773 at 2 (citing Fed. R. Crim. P. 31(b)(1), (2)).)

The law governing partial jury verdicts was discussed above with regard to Johnson's alternative motion for new trial.  The verdict form was tendered to the Court upon notification that the jury reached a unanimous verdict in both Johnson's and Gillespie's case.  (ECF No. 727 at 2.)  Question 21 of the verdict form was to be answered if the jury found Gillespie guilty in either Question 19 or Question 20.  (*See* ECF No. 658 at 6.)  The jury returned a verdict of guilty to Question 19, so Question 21 should have been answered.  (*See id.*)  As discussed above, it was proper for the Court to publish a partial verdict as to those counts on which the jury reached a unanimous verdict and to require them to deliberate further as to the counts on which they had not decided.  *See, e.g.*, *McKinney*, 822 F.2d at 950; *see also* Fed. R. Crim. P. 31(b)(2).  The Court read the verdict as it stood in open court and worked with counsel to draft further instruction as to how the jury should proceed with the questions that should have been answered, including Question 21.  (*See* ECF No. 727 at 19–20.)  Again, the interests of justice do not require a new trial on this ground because the Court was acting within its discretion.  *See Perry*, 335 F.3d at 320.

   2.   Motion for Judgment of Acquittal as to Count Fourteen

Second, Gillespie moves for a new trial based on his oral motion on day eight of the trial on January 23, 2015, for a judgment of acquittal as to Count Fourteen related to conspiracy to

34

obstruct justice.  (ECF No. 765 at 1.)  The Government argues that regardless of whether this ground is viewed under Federal Rule of Civil Procedure 29 or 33, it was properly denied at trial and that there was substantial evidence to support the jury's verdict, including Barcliff's and Jamie Field's ("Fields") testimonies as well as telephone conversations between Fields and Gillespie that establish Gillespie's intent to work with Fields to promote a false alibi.  (ECF No. 773 at 3–4.)

Count Fourteen of the Indictment charges Gillespie with conspiracy to obstruct justice in violation of 18 U.S.C. § 371 from on or about January 29, 2014, to on or about May 27, 2014. (ECF No. 418 at 20–24.)  Section 371 provides, in pertinent part, "If two or more persons conspire either to commit any offense against the United States, or any agency thereof . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a crime against the United States]."  18 U.S.C. § 371.  The Indictment charges Gillespie with a multiple object conspiracy—that he and others conspired to commit the offense of making materially false, fictitious, and fraudulent statements to a Special Agent with the FBI in violation of 18 U.S.C. § 1001(a)(2),[11] and to corruptly endeavor to influence, obstruct, and impede the due administration

---

[11] The essential elements of the substantive crime of making a false statement in violation of 18 U.S.C. § 1001(a)(2) are as follows:

> First:    The person charged made a false, fictitious, or fraudulent statement or representation;
>
> Second: The person charged acted knowingly and willfully when he made the false, fictitious, or fraudulent statement or representation; and
>
> Third:    The false, fictitious, or fraudulent statement or representation was material to a matter within the jurisdiction of the governmental agency.

(ECF No. 656 at 42.)  The Court instructed the jury as follows:

> The word "willfully" means that the defendant committed the act voluntarily and purposely, and with knowledge that his conduct was, in a general sense, unlawful.  That is, the defendant must have acted with a bad purpose to disobey or disregard the law.  The government need not prove that the defendant was aware of the specific provision of the law that he is charged with violating or any other specific provision.

of justice by encouraging and soliciting false testimony in violation of 18 U.S.C. § 1503.[12]   (ECF No. 418 at 20.)   The Government must have proven that at least one of the two objects was an objective of the conspiracy in which Gillespie participated and that Gillespie knowingly conspired to commit at least one of those two objects.   *See United States v. Vinson*, 852 F.3d 333, 352 (4th Cir. 2017) (noting that even though the § 371 conspiracy involved multiple alleged objects, the jury only needed to find against the defendant on one of those objects).

The jury in this case was instructed, after no objection by the parties, (*see* ECF No. 769 at 87), that to convict Gillespie of Count Fourteen, the United States must prove each of the following elements beyond a reasonable doubt:

> First:    That two or more persons agreed or came to a mutual understanding to accomplish a common and unlawful plan, that is, making a false, fictitious, or fraudulent statement in violation of 18 U.S.C. § 1001(a)(2) or corruptly endeavoring to influence, obstruct, or

---

(*Id.* at 43.)   This instruction reflects the following definition that was provided by the trial court and upheld by the Second Circuit in *United States v. Whab*:

> An act is done willfully if it is done knowingly, intentionally and with a bad purpose, a purpose to do something that the law forbids.

> In determining whether a defendant has acted knowingly and willfully, it is not necessary for the Government to establish that the defendant knew that he was breaking any particular law or particular rule.   He need only have been aware of the generally unlawful nature of his actions.

355 F.3d 155, 159 (2d Cir. 2004), *cert. denied*, 541 U.S. 1004.   *See also United States v. Starnes*, 583 F.3d 196, 211–12 (3d Cir. 2009) (applying the Supreme Court's interpretation of "willfully" in *Bryan v. United States*, 524 U.S. 184, 195 & n.23 (1998), "'requiring only knowledge that the conduct is unlawful,' as opposed to specific 'knowledge of the law,'" to a violation of § 1001); *United States v. Brandt*, 546 F.3d 912, 916 n.2 (7th Cir. 2008).

[12] The essential elements of the substantive crime of corruptly endeavoring to influence, obstruct, or impede the due administration of justice by encouraging and soliciting false testimony in violation of 18 U.S.C. § 1503 are as follows:

> First:    There was a pending judicial proceeding;

> Second:  The defendant had knowledge or notice of the pending judicial proceeding; and

> Third:    The defendant acted corruptly, that is with the intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice.

(ECF No. 656 at 42.)

36

impede the due administration of justice by encouraging and soliciting false testimony in violation of 18 U.S.C. § 1503;

Second:   That the defendant voluntarily and intentionally joined in the conspiracy;

Third:   That the defendant knew the purposes of the agreement or mutual understanding when he joined the conspiracy; and

Fourth:   At some time during the conspiracy, a member of the conspiracy knowingly performed one of the overt acts charged in Count Fourteen of the Indictment in order to advance the purpose of the conspiracy.

(ECF No. 656 at 39.)   *See also* 2 Fed. Jury Prac. & Instr. § 31.03 (6th ed. 2015).

On day eight of the trial, Gillespie moved for a judgment of acquittal as to Count Fourteen due to insufficient evidence to meet the beyond-reasonable-doubt standard.   (ECF No. 760 at 82.) The Government responded that sufficient evidence was presented at trial in the form of Barcliff's testimony, a letter written by Barcliff, and telephone recordings of Gillespie's conversations with his mother.   (*See id.* at 83–86.)   The Court denied the motion on the record and stated that "[t]here [was] evidence that Defendant Gillespie and Robert Barcliff were working together, came to an agreement, the purpose of which [was] to provide false information to the FBI regarding Barcliff and, certainly, Gillespie's participation in these crimes and, also, an agreement to procure a false alibi from Jamie Fields, and the overt act with regard to Mr. Gillespie calling Ms. Fields was proven up [January 22, 2015] with the recording."   (*Id.* at 87.)

During the direct examination of Barcliff, the Government inquired about a recorded telephone conversation between Barcliff and Gillespie after Gillespie's arrest.   (*See* ECF No. 631 at 95.)   The Government asked Barcliff what he and Gillespie were discussing on the recording that was played in open court.   (*See id.* at 97.)   The witness responded, "We're talking about an

attempted robbery that happened at Roxalana and we was trying to get an alibi together the best that we can over phone." (*Id.*) Further, Barcliff testified that he and Gillespie were housed together for three days at South Central Regional Jail. (*Id.* at 106–07.) In response to a question about what was the subject of conversations the two had while incarcerated together, Barcliff testified that the two "started strategizing" about how they were going to help each other get out of their predicament. (*See id.* at 107.) The crucial part of the testimony came during the following exchange on the Government's direct examination of Barcliff:

> Q: I'm going to turn your attention to January of 2014. Was that when you signed your plea agreement with the United States?
>
> A. Yes.
>
> . . .
>
> Q: Were you moved by the Marshal Service in anticipation of your plea hearing?
>
> A: Yes.
>
> . . .
>
> Q: Were you housed anywhere with Defendant Gillespie?
>
> A: Oh, I was in South Central, and I was housed right beside of him.
>
> Q: How long were you at South Central Regional Jail?
>
> A: Three days.
>
> Q: While you were there, did you have conversations with Defendant Gillespie?
>
> A: Yes.
>
> Q: What did the two of you discuss?
>
> A: We discussed my plea hearing, my plea agreement, and I basically told him that, you know, I'm about to be debriefed, but I had to take the plea. There wasn't no way I could beat it. I mean, everybody was already telling, so I could try

to do my best in helping [him] get out of this, and so we started strategizing about how we was going to do that.

Q: And what did the two of you strategize?

A: I basically told him that, you know, I'm going to tell them what I did, but I'm going to leave you out of everything the best I can.

Q: And did he agree to that?

A: Yes.

Q: And what was he going to do for you in return?

A: All I wanted him to do was continue his, you know, his music career and look out for me when I do the time and he's at home.

Q: And how did you want him to look out for you?

A: Just don't forget me.   You know, send me money, write me.

Q: And what were you not going to implicate him in?

A: Any of the robberies.

Q: What effect did the two of you believe it would have if you lied about his involvement?

A: We would be successful and he wouldn't be found guilty in [sic] anything.

(*Id.* at 107–08.)   Barcliff went on to testify that he lied to FBI Special Agent Hugh Mallet on February 3, 2014, when he said that he never committed a robbery with Gillespie.   (*See id.* at 109; *see also id.* at 21–22.)

Barcliff and Gillespie also discussed using Barcliff's female friend as an alibi for Gillespie. (*Id.* at 108.)   "[T]he plan was for [Barcliff] to contact Ms. Fields and tell her to come see [him] so [he] could talk to her in person about what was going on . . . Her role was going to [be to] say that in the Bristol robbery, that she met up with [them] and [they] were with her all night."   (*Id.*)   The

39

Court admitted into evidence the Government's Exhibit 25-A, which Barcliff confirmed was a February 7, 2014, recording of Gillespie "telling his mother the agreement [Barcliff] made with him." (*Id.* at 113–14. *See* ECF No. 674-3, 674-4.) Barcliff affirmed that "the agreement meant that [Barcliff] was going to try to save [Gillespie's] life" by "get[ing] him off the charges." (ECF No. 631 at 116.)

The Government called Fields as a witness, and she testified as to telephone conversations and transcripts of calls Gillespie made to her. (*See* ECF No. 758 at 164–78.) After playing a portion of the calls in open court, the Government asked the witness, "What was your understanding the caller asked you at that point in time?" (*Id.* at 176.) Fields responded, "To say that I was with them in Bristol at some point." (*Id.*) The witness further testified that despite the request for her to be an alibi for Gillespie, she did not comply "[b]ecause that would not have been true . . . ." (*Id.* at 177.) Ultimately, the caller, who Fields identified as Gillespie, told her his intent for asking her to provide him an alibi: "I'm trying to make sure all of us go home together . . . ." (*Id.* at 175.)

The Indictment provides several overt acts that were allegedly carried out in furtherance of the conspiracy, including a phone call Gillespie made to "JF" during which he "asked her to provide a cover for him for the March 22, 2012[,] Bristol, Virginia[,] robbery . . . ." (ECF No. 418 at 23.) Fields testified that she did receive such a call and that the subject of the conversation was an attempt by Gillespie to convince her to provide for him a false alibi. (*See* ECF No. 758 at 176–77.) Regardless of the witness' refusal to carry out the scheme, the Court finds that her testimony provides evidence on which a jury may find beyond a reasonable doubt that the elements of § 371 are satisfied. The evidence showed that Gillespie reached two agreements with

Barcliff—one for Barcliff to provide false statements to law enforcement and another to encourage Fields to provide false testimony. Gillespie voluntarily and intentionally joined the conspiracy and understood the purposes of the agreement as evidenced by the telephone conversation between Gillespie and his mother. Finally, overt acts were carried out in the form of Barcliff lying to the FBI and Gillespie calling Fields to persuade her to provide a false alibi for him.

The Court finds that on Count Fourteen, there was no unjust error requiring a new trial under the standard of Rule 33. *See Arrington*, 757 F.2d at 1485–86. The testimony above indicates that Gillespie had notice of a pending judicial proceeding. The original indictment in this case naming both Barcliff and Gillespie was filed on March 28, 2013. (ECF No. 1.) That indictment was the reason for their incarceration at the time of the relevant events. Barcliff and Gillespie devised their unlawful plans while housed beside each other after Barcliff signed his plea agreement, and they explicitly discussed Barcliff's plea agreement and upcoming plea hearing. Further, evidence presented at trial shows that Gillespie conspired to obstruct justice by corruptly endeavoring to influence, obstruct, or impede the due administration of justice by encouraging and soliciting false testimony from Fields in violation of § 1503. As long as the evidence proves that Barcliff and Gillespie conspired to violate § 1503—one of the two underlying offenses in Count Fourteen—and that Gillespie took a step in carrying out that conspiracy by calling Fields, then a finding of guilt as to Count Fourteen is appropriate.[13] The oral motion was considered and denied

---

[13] When Gillespie moved for a judgment of acquittal at trial as to Count Fourteen, his argument was based on the telephone conversation between Gillespie and Fields and the fact that Fields did not agree to participate in the false alibi scheme. (*See* ECF No. 760 at 82, 87.) Gillespie's counsel stated the following at trial: "The telephone conversation that the Court heard, as the Court correctly pointed out, between my client and the witness who testified yesterday, the medical student, she didn't take him up on any of that, and I simply repeat that the evidence is inadequate to meet the standard of beyond a reasonable doubt on the conspiracy count." (*Id.* at 87.) As explained above, the evidence was adequate for a finding of guilt as to Count Fourteen with § 1503 as the object of the conspiracy. While the Court has not focused its analysis on the other charged underlying offense, § 1001, because it is a weaker basis for a guilty finding as to Count Fourteen, the evidence only needs to show that one of the two underlying offenses was

under Rule 29 at trial.   As the above discussion explains, sufficient evidence existed to show that the jury did not "hijack" the standard of beyond a reasonable doubt, *see Jackson*, 443 U.S. at 317 n.10, so the Court's denial of the oral motion at trial was proper.   The Court finds support for its in-court ruling, and the interests of justice do not require a new trial on this ground.

### 3.   Motion to Dismiss Counts One and Two on Constitutional Grounds

Gillespie's motion is also based on the joint oral motion made by him and Johnson at the pretrial motions hearing on October 6, 2014, to dismiss Counts One and Two based on a violation of constitutional rights—that is, "based on the government's use of the Hobbs Act."   (ECF No. 765 at 1–2.)   At the pretrial motions hearing, Johnson argued that the Government's use of the Hobbs Act in the Indictment was overbroad and/or the Hobbs Act as passed by Congress is overbroad.   (*See* ECF No. 589 at 50–53.)   He stated that the Indictment "never charged [Johnson] with going into a market or place of commerce.   It said he went into a home and that he stole personal property."   (*Id.* at 50.)   Johnson argued that the *U.S. Constitution*'s Commerce Clause does not extend to items in somebody's home that are personal property regardless of where the property existed prior to its placement in the home.   (*See id.* at 51.)   Johnson argued, in the alternative, that even if the Government correctly applied the Hobbs Act as written to cover items of personal property in the home, the Hobbs Act itself is overbroad "if the statute is to be interpreted as it was in the indictment; that is, that stealing personal property all by itself is enough . . . to bring the robbery into federal court under the Hobbs Act . . . ."   (*Id.*)   Gillespie joined in the motion and argued that "the Hobbs Act exceeds Congress's interstate commerce power . . . and

---

the object, *see Vinson*, 852 F.3d at 352, which certainly is the case as to § 1503.   Gillespie does not suggest in his motion that the jury exclusively relied on § 1001 in reaching its verdict as to Count Fourteen, and the evidence supports a finding of guilt on at least one of the two underlying offenses.   Nothing more is necessary to conclude that the interests of justice do not require a new trial on this count.

the statute can't be called anything but vague if it's applied as it is here."  (*Id.* at 54.)   Further, Gillespie noted that this case cannot be reconciled with the Supreme Court's decision in *Lopez*, arguing that if "Congress lacks interstate commerce power to keep guns away from schools, it can't be that . . . these armed robbery crimes that should be prosecuted in state court can be federalized as easily as the government has done in this indictment . . . ."  (*Id.*)

The Government responds that the motion to dismiss was properly denied for the reasons stated on the record at the pretrial motions hearing.  (ECF No. 773 at 4.)   At that hearing, the Government relied on the Fourth Circuit's *Taylor* decision in arguing that "drug dealing is commerce . . . it can be regulated by Congress under the Hobbs Act and is subject to jurisdiction by the Court when the intent of the defendants in this case was to rob drug dealers . . . It doesn't matter that they robbed them at their residence."  (ECF No. 589 at 55.)   Thus, the Government avers, both the Hobbs Act as applied in *Taylor* and the Indictment are clear and constitutional. (*See id.* at 56.)

"[T]he jurisdictional predicate of the Hobbs Act requires only that the government prove a 'minimal' effect on interstate commerce."   *Taylor*, 754 F.3d at 222 (citing *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976)).   The Hobbs Act, which encompasses both lawful and unlawful commerce, was interpreted by the Fourth Circuit in *Taylor* to cover illegal drugs. *See id.* at 222–23.   "Drug dealing is a commercial enterprise and robberies of drug dealers threaten that enterprise; that is enough for a federal court to exercise jurisdiction under the Hobbs Act." *Id.* at 223 (citing *United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) (finding that "robberies of drug dealers . . . impact[ ] a trade that plainly is both economic and interstate in character")).   Therefore, the Fourth Circuit in *Taylor* sustained drug-related Hobbs Act

convictions, and the United States Supreme Court recently affirmed that decision. *See id.* at 225–26 & 226 n.\* ("The district court found that, because drug dealing enterprises inherently affect interstate commerce, any argument or evidence tending to show that the drugs in the particular case had not moved across state lines was not relevant. For the reasons expressed . . . that ruling was correct . . . ."); *see also* 136 S. Ct. 2074 (2016).

The Court relied on *Taylor* when it denied the joint motion on the record in the pretrial motions hearing. The Court concluded that because "*Taylor* is controlling" and the Court is "required to follow it," the defendants' position was foreclosed. (ECF No. 589 at 57.) The Indictment charges in Count One that Johnson and Gillespie, along with others, conspired to commit and actually committed "armed, 'home-invasion' robberies of people they believed to be drug dealers, in order to steal drugs, money and other drug proceeds, and firearms." (ECF No. 418 at 2.) The Indictment goes on to describe the Hobbs Act robberies that are alleged to have taken place and the fruits of those robberies. (*See id.* at 3–6.) The Indictment contends that drugs were taken during these armed robberies. Because drugs fall within the Fourth Circuit's interpretation of interstate commerce, the Hobbs Act applies to armed robberies of drug dealers.

Further, Count One is a predicate offense for Count Two. (*See id.* at 7.) Gillespie argues that a finding that Count One is unconstitutional necessarily leads to a finding that Count Two is also unconstitutional. (*See* ECF No. 480 at 11 n.1 ("[I]f count[ ] one . . . cannot pass constitutional muster, or if 18 U.S.C[ §] 1951, cannot pass constitutional muster, then count[ ] two . . . would be subject to dismissal . . . ."); ECF No. 589 at 49 (addressing Johnson's motion to dismiss at the pretrial motions hearing as a joint motion).) However, the Court found that Count One properly charges conspiracy to commit Hobbs Act robberies, so on this argument alone, the Court cannot

44

find any issue with the offense charged in Count Two.  *See Taylor*, 754 F.3d at 225–26 ("As Taylor challenged his conviction for using or carrying a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c) solely on the ground that the Hobbs Act predicate was infirm, that conviction too must be upheld.").  As with the first two grounds of this motion, the Court finds now that its previous ruling was proper as to the oral motion to dismiss Counts One and Two of the Indictment and that the interests of justice do not require a new trial on this basis.

    4.   <u>Verdict Against Weight of Evidence and Not Supported by Substantial Evidence</u>

Lastly, Gillespie's Motion for New Trial under Rule 33 argues that "[t]he jury's verdict was against the weight of the credible, unbiased evidence" because "[t]he only direct evidence on the Hobbs and Hobbs-related counts was from co-defendants and other witnesses who stood to gain from their agreements with the government, and who were therefore biased."  (ECF No. 765 at 2.)  For these reasons, Gillespie argues further, "the jury's verdict was not supported by substantial evidence."  (*Id.*)  The Government relies on the heavy burden Gillespie must meet to establish grounds necessitating a new trial in arguing that "the evidence of defendant's guilt at trial was overwhelming," including "testimony of co-defendants, co-conspirators, and victims," as well as Gillespie's recorded jail calls, text messages, letters, and rap lyrics.  (ECF No. 773 at 5.) Additionally, the Government notes the "physical evidence recovered from defendant's car such as firearms and ammunition that was either physically admitted into evidence or admitted through photographs" in arguing that the weight of evidence supports the guilty verdicts.  (*Id.*)

As set forth above, the jury found Gillespie guilty as to Counts One, Two, Five, Six, Ten, Eleven, Twelve, and Fourteen.[14]  Neither party objected to the jury charge, (*see* ECF No. 769 at

---

[14] The Court already determined that sufficient evidence existed to support a finding of guilty as to Count Fourteen of the Indictment during its discussion on the motion's second ground.

87), and the Court will use the instructions as provided to the jury in setting out the various elements that the Government was required to prove.

First, Count One of the Indictment charged Gillespie with conspiracy to commit armed robbery in violation of 18 U.S.C. § 1951. (ECF No. 418 at 1–6.) To prove that charge, the Government had to prove the following three elements:

> First: That the defendant entered into an agreement with one or more persons to commit one or more robberies affecting interstate commerce, as charged in Count One of the Indictment;
>
> Second: That the defendant had knowledge of that conspiracy; and
>
> Third: That the defendant knowingly and voluntarily participated in the conspiracy.

(ECF No. 656 at 20.) This count does not require any formal agreement or express statement of the agreement's purpose, details, or means of accomplishment. (*Id.*) The object of the conspiracy does not have to be successful, nor does a member of the conspiracy need knowledge of all available details. (*Id.* at 20–21.) A member becomes a knowing participant in the conspiracy when he, with understanding of the plan's unlawfulness, "knowingly encourages, advises or assists, for the purpose of furthering the undertaking or scheme." (*Id.* at 21.) While mere presence, mere similarity in conduct, or mere discussions of common aims and interests does not necessarily establish proof of a conspiracy, a member need not play a major role in the conspiracy to be convicted as a conspirator. (*Id.*) Finally, "[d]rug dealing is an inherently economic enterprise that affects interstate commerce." (*Id.* at 22–23.) *See also Taylor*, 754 F.3d at 222–23.

As to the agreement entered into by Gillespie to commit robberies, Barcliff testified that he, Gillespie, Johnson, Davis, and Glenn, came together in an attempt to remedy their financial

46

problems.  (*See* ECF No. 631 at 9–11; *see also* ECF No. 635 at 147 (confirming the existence of a factual stipulation attached to Glenn's plea agreement which reads, "[a]t sometime in late 2011 or early 2012, Mr. Glenn agreed to participate with Barcliff, Davis and Gillespie in armed home-invasion robberies of drug dealers").)   The Government asked Barcliff, "What did you all decide to do . . . to make money?"  (ECF No. 631 at 10.)   Barcliff responded that they "decided to rob drug dealers" and that he first discussed the idea with Johnson before later discussing it with Gillespie.  (*Id.*)   The basis for robbing drug dealers was the co-conspirators' assumption that drug dealers would not call the police.  (*See, e.g.*, ECF No. 683 at 14, 28 ("Q: When, if ever, did you commit a robbery on somebody you did not believe to be a drug dealer?  A: I haven't.  Q: And why did you only target drug dealers?  A: Like I said before, felt like they wouldn't call the police.").)   Glenn confirmed in his testimony both the existence of the agreement and Gillespie's participation in the conspiracy before explaining that the first robbery in Pittsburgh "was directed at an individual [Glenn] believed to be a drug dealer . . . ."  (*See* ECF No. 635 at 121–22, 124 ("Q: You were looking for drugs to steal?  A: To steal, yes.  Q: So you were looking about the house to find something to steal; isn't that correct?  A: Yes."), 137; *see also* ECF No. 632 at 10–11.)   Barcliff testified that Gillespie accompanied him along with Davis, Austin Simon, and Simon's girlfriend to Pittsburgh during the first planned robbery in the fall of 2011.  (ECF No. 631 at 11–12.  *See also* ECF No. 683 at 17 (Davis test.) ("Q: Who went with you?  A: It was me, [Gillespie], Robert [Barcliff], Austin [Simon] and Austin's girlfriend. . . .").)   Gillespie's role, according to Davis, was to "be with the other guys to take the weed" upon entering the residence.  (*See* ECF No. 683 at 15–16 ("Q: Did they take the marijuana?  A: Yes.  Q: Who took the marijuana?  A: Robert [Barcliff], Austin [Simon], and [Gillespie].").)

Barcliff testified as to a robbery he committed after the Pittsburgh robbery with Johnson and Glenn in Welch or Switchback, West Virginia. (*See* ECF No. 631 at 15–19.) Barcliff stated that he went back to that same residence near Welch "[a]bout three weeks later" with Gillespie, Glenn, and Davis, with the objective of robbing it again because Barcliff believed that there were more drugs and money in the house. (*See id.* at 21–22; *see also* ECF No. 632 at 21 (Glenn test.).) The victim of that robbery, Lipscomb, admitted at trial that he is known in McDowell County, West Virginia, as a marijuana distributor, (ECF No. 749 at 46–47), which supports the notion that the group conspired to return to the residence to rob Lipscomb of more drugs. Lipscomb testified that the robbers, in fact, took from his home that day a small amount of marijuana, shoes, jewelry, a TV, and a PlayStation 3. (*Id.* at 57–58. *See also* ECF No. 675 at 1 (listing the Government's Exhibits 3–5, 7–8, and 10–18 as photos of various shoes); ECF No. 676-3, 676-4, 676-5 (Gov't Exs. 28-D, 28-E, 28-F) (text messages related to the stolen items).)

Barcliff, Glenn, and Davis all testified as to an agreement the group, including Gillespie, had to commit a robbery in North Carolina. (*See* ECF No. 631 at 29–30; ECF No. 632 at 34–35; ECF No. 683 at 23.) Gillespie knew the potential victim and drove the participants to North Carolina in his Dodge Charger. (*See* ECF No. 631 at 30; ECF No. 632 at 35; ECF No. 683 at 23.) The plan, according to Barcliff, was to acquire money and drugs from the potential victim's residence, but the group fled the scene after Davis unsuccessfully tried to kick in the door. (*See* ECF No. 631 at 30.) Davis confirmed that the reason they drove to North Carolina to rob the potential target was because they "heard he had drugs and money." (ECF No. 683 at 23.) He also testified as to two other planned robberies involving him, Gillespie, Barcliff, and Glenn, in

Roanoke, Virginia, and Pittsburgh that were unsuccessful but, nonetheless, planned with the intention of stealing drugs and money.   (*See id.* at 28–29.)

Barcliff testified that Gillespie called him and identified a potential robbery victim located in South Charleston, West Virginia.   (*See* ECF No. 631 at 30–31.)   The victim was referred to and identified by Barcliff and Chrisshawn Perkins ("Perkins") at trial as "the Asian man."   (*See id.* at 33–34; ECF No. 758 at 44–45.)   Perkins, an acquaintance of Gillespie's, testified that he was with the Asian man when Perkins spoke with Gillespie on the phone to set up a buy for one pound of marijuana.   (*See* ECF No. 758 at 53–54.)   The robbery was set up, according to Barcliff's testimony, by Gillespie who was "to meet the victim and . . . purchase some marijuana" before Barcliff was supposed to step in and rob them both.   (ECF No. 631 at 31.)   Perkins testified that Gillespie got into the Asian man's car before the Asian man got out of the car and walked behind it to retrieve the marijuana from the trunk.   (ECF No. 758 at 55.)   At that point, Perkins stated that "[s]omebody with a mask, bandana around his face, with a hood on" put a gun to the Asian man's head and took the bag of marijuana from him.   (*See id.* at 55–56.)   Barcliff corroborated Perkins' testimony, stating that Gillespie met the Asian man as planned, and during an exchange involving a black bag with a pound of marijuana in it, Barcliff approached them from behind and robbed them both at gunpoint.   (*See* ECF No. 631 at 32–34.)   Perkins testified that after taking the bag of marijuana from the Asian man, Barcliff ran between a nearby apartment building, and Gillespie took off in the same direction.   (*See* ECF No. 758 at 57–58.)

Further, Barcliff testified as to Gillespie's participation in another agreement as part of the conspiracy to commit a robbery in March 2012 in Huntington, West Virginia.   (*See* ECF No. 631 at 63–64.)   Glenn testified that he met a woman named Anne at Gillespie's apartment and that the

woman knew someone who could be a target victim because he had heroin or another drug.  (*See* ECF No. 632 at 49–50.)  Glenn testified that Anne set up the robbery, (*see id.* at 51), although Barcliff and Davis stated that Gillespie set up the robbery, (*see* ECF No. 631 at 63; ECF No. 683 at 41).  Nonetheless, the Government took Barcliff through text messages sent to him by Gillespie alerting Barcliff that the robbery was still on and that they were about to realize where drugs and money were located.  (ECF No. 631 at 63–64 (verifying text messages by which Gillespie was persuading Barcliff to leave work because Gillespie had a "lick" with "pounds of marijuana").)  The robbery did not work out though—Anne was supposed to go in the apartment and leave the door open on her way out for Glenn, Davis, and Gillespie to enter.  (*See* ECF No. 632 at 50; ECF No. 683 at 41–42.  *See also* ECF No. 676-9 (Gov't Ex. 28-K) (text messages from Anne to Gillespie as to her actions while inside the apartment).)  However, the resident with whom Anne met inside, who was supposed to have the drugs, was exiting the apartment at the same time the three men were going to enter, "so everybody just went their own way, as in running."  (ECF No. 632 at 50; *see also* ECF No. 683 at 42 (Davis test.) ("She had went inside and was texting [Gillespie], letting him know what was going on, and right, I guess, when we felt like it was the right time, we just kind of got out the car and went up to the house and was going to wait on her to come out and we were going to go in and we got up to the door.  Keith [Glenn] took off running and so we all just ran."); ECF No. 676-11 (Gov't Ex. 28-O) (text message indicating that a recent robbery "went south").)

    The Court finds that this testimony provides sufficient evidence to find Gillespie guilty as to Count One of the Indictment.  Namely, Gillespie agreed with Barcliff and others to commit robberies of drug dealers in the manner detailed by the Indictment.  Gillespie had knowledge of

the conspiracy and furthered the conspiracy through his participation.   The interests of justice do not require a new trial based upon the evidence considered by the jury in relation to Count One.

Count Two of the Indictment charges Gillespie with violating 18 U.S.C. § 924(o), which makes it a crime for anyone to conspire to commit offenses in violation of 18 U.S.C. § 924(c), that is, to knowingly use and carry a firearm during and in relation to a crime of violence, including robberies affecting interstate commerce and conspiracy to commit such robberies in violation of 18 U.S.C. § 1951.   (*Id.* at 24.)   This count requires proof of the following elements:

> First:     That the defendant entered into an agreement with one or more persons to commit the crime of knowingly using and carrying a firearm during and in relation to a crime of violence for which he could be prosecuted in a court of the United States, as charged in Count Two of the Indictment;
>
> Second:     That the defendant had knowledge of that conspiracy; and
>
> Third:     That the defendant knowingly and voluntarily participated in the conspiracy.

(*Id.*)

When agreeing to rob drug dealers to obtain money, Barcliff testified that he and Gillespie, among others, came to an understanding that they "would need a gun to rob a drug dealer."   (ECF No. 631 at 10.)   Barcliff further testified that before the first robbery in Pittsburgh, he showed everyone in the car, including Gillespie, the gun that he was carrying.   (*Id.* at 13.)   When Gillespie, Barcliff, Glenn, and Davis returned to the residence in Switchback three weeks after an initial robbery at that residence, Barcliff testified that he, Glenn, and Davis all had firearms and that everyone, including Gillespie, knew about the firearms.   (*See id.* at 23–24 ("Q: Was everyone aware of the firearms?   A: Yes.   Q: How do you know that?   A: We showed each other in the

51

car."). *But see* ECF No. 683 at 20 (Davis test.) ("Q: Did you have [a firearm]?  A: No, not at that time.").)  Glenn and Davis also testified that Gillespie knew that at least one firearm was being used.  (*See* ECF No. 632 at 23 (Glenn test.) ("Q: Okay.  Did Defendant Gillespie know you had a gun?  A: I would assume so.  Everybody had them out.  Q: Had them out in the car?  A: Yeah. Q: So everybody could see that you all were armed?  A: Yes, sir.  Q: So it was no secret that you were hiding a gun or anything?  A: No, sir."); ECF No. 683 at 20 (Davis test.) ("Q: Did you have -- did anyone have a firearm?  A: Yes, there was a firearm . . . Q: How do you know that either Robert Barcliff or Keith Glenn had a firearm?  A: I remembered seeing one of them hold it up to the guy as they went in.  Q: From where you were sitting, could Defendant Gillespie have also seen him hold up the firearm?  A: Yes, ma'am.").)  Davis testified further in relation to a robbery in Kanawha City, West Virginia, that there was an agreement in place between the participants that firearms were going to be used during the course of the crime.  (ECF No. 683 at 26 ("Q: Was there an agreement regarding the use of firearms?  A: Yeah.  I mean, we never had planned on, you know, actually firing them off or nothing, just to kind of, I guess, scare, just scare tactic.").)

Moreover, Barcliff and Perkins testified that Gillespie conspired with Barcliff to set up the robbery of the Asian man in South Charleston.  (*See* ECF No. 631 at 30–34; ECF No. 758 at 55–56.)  The plan involved Gillespie meeting up with the Asian man and purchasing marijuana from him and Barcliff stepping in during the transaction and robbing them both.  (ECF No. 631 at 31.) Based on earlier testimony by Barcliff, it was already established that he and Gillespie agreed that a gun would be needed to rob drug dealers.  (*See id.* at 10.)  Barcliff testified that guns were used in at least one earlier robbery in which Gillespie participated.  (*See id.* at 23–24.)  In accordance with the plan, Barcliff testified that he did use a gun when robbing the victim in South Charleston,

(*see id.* at 32–34), and Perkins confirmed that Barcliff put a gun to the man's head during the robbery, (ECF No. 758 at 55–56).

This testimony provides sufficient evidence to convict Gillespie on Count Two. It establishes that Gillespie entered into an agreement to use firearms in relation to their plan to rob drug dealers. While Gillespie may not have played a major role in this conspiracy, the evidence shows that the conspiracy to rob drug dealers involved an agreement that firearms would be used and that Gillespie, in fact, knew that others were carrying firearms during the commission of at least one robbery before helping set up a subsequent robbery. (*See also* ECF No. 679-2 (Gov't Ex. 94) (rap lyrics written by Gillespie about being addicted to "licks" and describing a particular "lick" as "motivated by a brick" and involving firearms, zip ties, and money).) Gillespie had knowledge of this conspiracy, and the evidence confirms that he voluntarily participated in the scheme. The Court finds that a new trial is not warranted based on a lack of evidence in relation to Count Two.

Counts Five and Eleven,[15] each charging Gillespie with committing a robbery affecting interstate commerce in violation of 18 U.S.C. § 1951, require proof of the following elements:

First: The defendant under consideration took or obtained personal property from a person or from the presence of another;

Second: The defendant under consideration did so knowingly by robbery; and

Third: In so acting, interstate commerce was obstructed, delayed, or affected.

---

[15] Count Eleven included an alternative charge against Gillespie for attempted robbery affecting interstate commerce. (ECF No. 418 at 17.) However, the jury found Gillespie guilty of robbery affecting interstate commerce as charged in Count Eleven, so it did not address the alternative charge of attempt. (ECF No. 658 at 6 (Questions 19 and 20).)

(ECF No. 656 at 24.)  "Robbery" means the unlawful taking or obtaining of personal property[16] from another against his or her will by means of threatening or actually using force, violence, or fear[17] of injury, immediately or in the future, to his or her person or property.  (*Id.* at 23.)  A defendant need not intend for interstate commerce to be affected, nor must a defendant have knowledge that interstate commerce is actually affected.  *See United States v. Strayhorn*, 743 F.3d 917, 925 (4th Cir. 2014) (citing *United States v. Buffey*, 899 F.2d 1402, 1403 (4th Cir. 1990)); *see also Taylor*, 754 F.3d at 222; *United States v. Spagnolo*, 546 F.2d 1117, 1119 & n.5 (4th Cir. 1976) ("It is of no moment whether the defendants intended or contemplated an effect on commerce . . . .").  Count Five is based on a robbery that the prosecution claims occurred on or about December 13, 2011, near Charleston, West Virginia, and Count Eleven relies on a robbery occurring on or about March 22, 2012, in or near Dunbar, West Virginia.  (ECF No. 418 at 10, 17.)

These two counts alternatively charge Gillespie with aiding and abetting the underlying offense in violation of 18 U.S.C. § 2.  (*Id.*)  The Indictment charged in Count Five that Gillespie, Barcliff, Davis, and Glenn aided and abetted each other in the commission of an offense violating § 1951, (*id.* at 10), while it charged in Count Eleven that Gillespie, Davis, and Glenn aided and abetted each other in the commission of a robbery in violation of § 1951, (*id.* at 17).  To convict Gillespie of this alternative charge of aiding and abetting, the Government must have proven the following elements:

> First:        Another person actually committed each of the essential elements of the offense charged in that Count of the Indictment;
>
> Second:    The defendant knew that the offense was to be committed or was being committed;

---

[16] "Property" includes money and other tangible and intangible things of value.  (ECF No. 656 at 23.)
[17] "Fear" means an apprehension, concern, or anxiety about physical violence or harm or economic loss or harm that is reasonable under the circumstances.  (ECF No. 656 at 23.)

| Third: | The defendant knowingly did some act with the purpose of aiding and abetting and encouraging the commission of that offense; and |
|---|---|
| Fourth: | The defendant acted with the intention of causing the crime charged to be committed. |

(ECF No. 656 at 35.)   Once found beyond a reasonable doubt that someone else committed one of the criminal acts, the Government must show that Gillespie aided and abetted the commission of the crime by knowingly associating himself with the crime charged and that he knowingly sought by some act to help make the crime succeed.   (*Id.* at 35–36.)   This latter element requires more than mere presence during the crime's commission or mere association with a person or persons who committed the crime.   (*Id.* at 36.)   The alternative offense does not require that Gillespie have physically committed either of the underlying crimes himself or that he knew interstate commerce would be affected, and the jury could have found Gillespie guilty of either committing the crimes himself or aiding and abetting the crimes' commission.   (ECF No. 658 at 3, 6 (Questions 9 and 19).)

As to the Hobbs Act robbery charged in Count Five, Barcliff testified that Gillespie participated in a robbery around December 13, 2011, with him and two others in Kanawha City, West Virginia, in the hopes of retrieving high grade marijuana from the residence.   (*See* ECF No. 631 at 26; *see also* ECF No. 632 at 38; ECF No. 683 at 24 (Davis test.) ("Q: How did you identify the person who lived there as somebody to rob?   A: Robert.   Barcliff.   Q: Do you know what Robert Barcliff knew about that person?   A: Said he was supposed to have some weed, some money.").)   Davis confirmed his involvement in this robbery as well as the participation of Barcliff, Glenn, and Gillespie.   (ECF No. 683 at 213.)   Glenn testified that Gillespie drove the group to the location, (ECF No. 632 at 41), and Barcliff said at trial that Gillespie went in first

55

with Davis and that all four of the participants were armed.   (*See* ECF No. 631 at 26–27.)   Glenn

reiterated later in his testimony that Gillespie committed this robbery.   (ECF No. 635 at 143 ("Q:

In fact, did you commit other robberies of a man that had two small children in his apartment?   A:

Yes, sir . . . Q: With Defendant Gillespie?   A: Yes, sir.").)

Theodore Dues ("Dues"), who was the resident of that apartment, testified that four men

broke into his home while he was there with his two children, pointed guns at him, and forced him

into a back room.   (*See* ECF No. 682 at 184–85.)   He testified that the masked robbers[18] took

approximately $500 from his wallet, but he was unable to identify any of the assailants.   (*Id.* at

186, 190 ("Q: So [ ] you were not able to identify any of the people that broke into your home that

day?   A: No, sir, not at all.").)   Dues testified that he began selling drugs around 2008–2009 and

that he had a couple grams of marijuana in the residence at the time of the robbery, but he did not

explicitly state that the marijuana was taken during the incident, (*see id.* at 187–188 ("Q: So what

happened once they got the money?   Could you tell whether or not they found the marijuana?

What were they doing through your house?   A: I mean, they tore up the house.   I mean, stuff

everywhere, papers everywhere."); *see also id.* at 201), although Glenn and Davis testified that a

quantity of marijuana was taken from a Mason jar.   (*See* ECF No. 632 at 39, 40; *see also* ECF No.

683 at 27–28 (Davis test.) ("Q: What did you and the others take from this man?   A: I think he

had about a thousand dollars or so on him and just the weed.").)

Related to the charge in Count Eleven, Barcliff testified that Gillespie relayed to him

knowledge of a target victim in Dunbar, West Virginia, who supposedly had "large sums of

---

[18] Barcliff identified a Gator ski mask introduced into evidence by the Government that he previously owned and
testified that he believed Gillespie wore the mask at one time.   (*See* ECF No. 631 at 88–89; *see also* ECF No. 679-11
(Gov't Ex. 117).)

cocaine, cash, and marijuana." (ECF No. 631 at 77–78; *see also id.* at 30–33 ("A: . . . [H]e was identified through [Gillespie].  Q: What did [Gillespie] tell you?  A: He gave me a phone call that said that he had something, a lick.  Q: What did you understand that to mean?  A: I just thought that that meant that we was going to rob a drug dealer."); ECF No. 683 at 69–70 (Davis test.) (indicating that the target victim was known for having high grade marijuana).)  Barcliff and Gillespie had a conversation reflecting "[t]hat [they] needed to get him and get the drugs," (ECF No. 631 at 78), and Glenn confirmed that Gillespie set up this robbery in Dunbar.  (*See* ECF No. 635 at 21, 143–44 ("Q: And did you, in fact, rob an individual in Dunbar that you referred to as 'the Asian man' with Defendant Gillespie?  A: Yes, sir.").)  Mary Beth Cutlip ("Cutlip") testified that she overheard a conversation between Gillespie, Glenn, Davis, and Barcliff, in the parking lot of her apartment about an upcoming robbery.  (*See* ECF No. 758 at 89–91.)  She said that the men were arguing because they wanted Barcliff to call off work so he could join them, but Barcliff "said to wait because he could not call off work." (*Id.* at 91.)  Cutlip stated that after Barcliff left for work that evening, Gillespie, Davis, and Glenn left her apartment in Gillespie's red Charger "to do it." (*Id.*)

Glenn testified that he, Davis, and Gillespie left Cutlip's apartment in Gillespie's car and went to the target's apartment in Dunbar where they sat for some time.  (ECF No. 635 at 24.) After the target victim did not arrive for a while, they went back to Cutlip's residence before returning to the target's apartment.  (*Id.*)  After leaving the residence and returning a third time, the three conspirators grabbed the victim as he was attempting to get in his car, which was still running, and led him back to the apartment.  (*See id.* at 25–26.)  Gillespie identified both the victim's car when it pulled up and the victim himself.  (*See* ECF No. 683 at 72.)  After entering

the apartment building but before reaching the apartment door, Davis testified that Gillespie attempted to zip-tie the victim's hands but only secured one of the wrists.  (*See id.* at 74.)  The victim told his wife, who was already inside, not to open the door, and once she started screaming, the three men decided it was too loud and took off.  (*See* ECF No. 635 at 27–28 ("[S]he don't [sic] open the door and she's screaming.  So, at this time, we only succeeded to put one zip-tie around his wrist, and I told them it was too loud, let's just go.").)  Gillespie and Glenn left the scene on foot while Davis drove the red Charger.  (*See id.* at 29–30.)  Despite not getting inside the apartment, Glenn testified that a wallet and car keys to the victim's BMW were stolen during incident.  (ECF No. 635 at 30.)

Cutlip testified that Davis called her "saying he needed [her] to come pick him up, that he had got left and he needed a ride."  (ECF No. 758 at 92; *see also* ECF No. 683 at 76 (Davis test.) (explaining that after he drove away from the Dunbar apartment, he parked the Charger "near a police station . . . and a laundromat" and called Cutlip to come get him).)  Cutlip then proceeded to pick up Gillespie and Glenn based on instruction from Davis, and she testified that Gillespie and Glenn were dressed in black and "dirty from wrestling around."  (ECF No. 758 at 93–94.) When asked if Gillespie said anything when he got into the car, Cutlip responded, "Just same thing that Brandon [Davis] said.  They were arguing.  Just -- things went bad.  They were just discussing what happened, how they needed to push the guy through the door to get him back in the home."  (*Id.* at 94.)  She drove the group back to her apartment, where Barcliff joined them after he got off work.  (*See id.* at 94–95; *see also* ECF No. 631 at 82 (Barcliff test.) (stating that after he got off work the night of the robbery on March 23, 2012, he went to Cutlip's house where Davis, Glenn, Cutlip, and Gillespie were located).)  Barcliff further testified that the three men

told him something along the lines of, "[w]e didn't get him," indicating that something went wrong with the robbery.  (ECF No. 631 at 81.)

The target victim in this Dunbar robbery called local law enforcement, and Lieutenant William Moss of the Dunbar Police Department responded to the Roxalana Hills Apartment Complex that evening.  (*See* ECF No. 758 at 130.)   Upon arrival, Lieutenant Moss testified that an Asian male who was "upset and nervous, pacing back and forth" was in the parking lot.  (*Id.*)  Lieutenant Moss observed black zip-ties on his right wrist and learned that the Asian man was robbed "by three black males who were outside of the apartment when he exited his apartment door."  (*Id.* at 131.)  Captain Scott Elliot of the Dunbar Police Department testified that people on the scene advised him that "two of the suspects had fled to the right of the front of the building . . . [and] [o]ne had actually got into a car and fled over the hill to the left."  (*Id.* at 143.)  Lieutenant Moss put out a "be on lookout for" ("BOLO") alert for a red Dodge Charger that left the scene.  (*Id.* at 133.)  A search of the area for two males who allegedly ran on foot did not reveal any evidence, but the Dunbar Police Department received a call after 1:00 a.m. on March 23, 2012, that the Nitro Police Department had the red Charger stopped.  (*Id.* at 134.)  Lieutenant Richard Foster of the Nitro Police Department made the traffic stop of both the Charger and another car that was driving in front of the Charger.  (*See id.* at 138–39.)   Lieutenant Moss arrived at the scene and observed a red Charger, several law enforcement agencies, and "three black males handcuffed sitting on the ground."  (*Id.*)  The victim's wallet was recovered from one of the males in the vehicle.  (*See id.*)

The Court finds that sufficient evidence was proven up at trial for a reasonable jury to convict Gillespie on Counts Five and Eleven of the Indictment.  First, the evidence shows that

Gillespie participated in both robberies—the robbery in Kanawha City and the robbery in Dunbar. Gillespie drove the participants to both robberies and aided in robbing both victims. Gillespie's actions demonstrate that, at minimum, he aided and abetted his co-conspirators in the taking of property with clear knowledge of the robbery. The evidence shows that personal property in the form of drugs and money were taken during the Kanawha City robbery and that money and car keys were stolen during the Dunbar robbery. Based on Gillespie's actions, interstate commerce was affected. The evidence here does not "weigh[ ] so heavily against the verdict" on Counts Five and Eleven as to require a new trial. *See Arrington*, 757 F.2d at 1485.

Counts Six and Twelve, which charge Gillespie with using firearms in a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A), are proved by the following two elements:

> First: That on or about the dates alleged in Counts . . . Six . . . and Twelve of the Indictment, the defendant under consideration knowingly used, carried, brandished, or discharged a firearm; and
>
> Second: That the defendant under consideration did so during and in relation to a crime of violence for which he may be prosecuted in a court of the United States.

(*Id.* at 26.) The jury charge provided that the offenses charged against Gillespie in Counts One, Five, and Eleven, were crimes of violence.[19] (*Id.*) To find that a firearm was used for purposes

---

[19] *See* cases cited *supra* note 6 for authority supporting the proposition that Hobbs Act robbery is a crime of violence for purposes of § 924(c). The following cases from both within and outside of the Fourth Circuit support the proposition that conspiracy to commit Hobbs Act robbery is also a crime of violence: *see United States v. Turner*, 501 F.3d 59, 67–68 (1st Cir. 2007) (taking into account "the great weight of authority from other circuits" and concluding that "conspiracy under the Hobbs Act constitutes a 'crime of violence' for purposes of 18 U.S.C. § 924(c)"); *United States v. Phan*, 121 F.3d 149, 152–53 & n.7 (4th Cir. 1997) (citing *United States v. Elder*, 88 F.3d 127, 128–29 (2d Cir. 1996) (per curiam) (holding that Hobbs Act conspiracy to commit armed robbery is by definition a felony involving substantial risk that physical force may be used and therefore is a proper predicate for a § 924(c)(1) conviction)) (affirming the defendant's conviction and noting that "Hobbs Act conspiracy to commit robbery . . . is a separate crime of violence providing its own predicate for § 924(c)(1) liability"); *see also United States v. Hernandez*, No. 2:16–cr–39–NT, 2017 WL 111730, at *9–11 (D. Me. Jan. 11, 2017) (concluding "easily" that while Hobbs Act conspiracy is not a crime of violence under the force clause, it is a crime of violence under the residual clause, which the court held constitutional in light of the Supreme Court's *Johnson* decision discussed later in this memorandum opinion); *Hernandez v. United States*, No. 10-CR-3173-H-3, 2016 WL 7250676, at *3–4 (S.D. Cal. Nov. 7, 2016)

of these offenses, Gillespie or one of his co-conspirators needed to have actively employed the firearm, such as brandishing, displaying, or firing or attempting to fire it, so that either it played a role in the crime or Gillespie or the co-conspirator intended it to play a role in the crime.   (*Id.* at 26–27, 29–30.)   *See also Pinkerton v. United States*, 328 U.S. 640, 645–46 (1946); *United States v. Mingo*, 237 F. App'x 860, 865 (4th Cir. 2007) (citation omitted).   Alternatively, Gillespie may be found guilty of these offenses if he or one of his co-conspirators carried a firearm during and in relation to the underlying crimes.   (*See* ECF No. 656 at 27.)   *See also Muscarello v. United States*, 524 U.S. 125, 126–27 (1998).   The Fourth Circuit turns to the plain meaning of "carry" for purposes of § 924(c)(1) and "requires knowing possession and bearing, movement, conveyance, or transportation of the firearm in some manner," regardless of whether it is actually displayed.   *See United States v. Mitchell*, 104 F.3d 649, 652–54 (4th Cir. 1997).   The Government need only have proven that Gillespie or one of his co-conspirators either used, carried, brandished, or discharged a firearm—proof of any one will have been sufficient.   (ECF No. 656 at 27.)   *See also United States v. Vasquez-Castro*, 640 F.3d 19, 25–26 (1st Cir. 2011) (citation omitted) ("So long as there is sufficient evidence that a co-conspirator carried or used a firearm in

---

(denying the defendant's § 2255 motion and finding that "conspiracy to commit Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(B)"); *United States v. Williams*, 179 F. Supp. 3d 141, 154–55 (D. Me. 2016) (quoting 18 U.S.C. § 1951(a)) ("[T]he Hobbs Act itself includes a conspiracy as an element . . . Under the statute, interference with commerce by robbery is not a distinct offense from conspiracy to interfere with commerce by robbery.   Therefore, the categorical analysis does not differ with respect to a charge of Hobbs Act robbery or a charge of conspiracy to commit a Hobbs Act robbery.").   *But see United States v. Baires-Reyes*, 191 F. Supp. 3d 1046, 1049–51 (N.D. Cal. 2016) (finding that the force clause does not apply in an analysis of whether conspiracy to commit Hobbs Act robbery is a crime of violence because the elements of the conspiracy do not require "actual, attempted, or threatened physical force" and that § 924(c)'s residual clause is unconstitutional under the Ninth Circuit's decision in *Dimaya v. Lynch*, 803 F.3d 1110, 1117 (9th Cir. 2015), *appeal docketed*, 85 U.S.L.W. 3114 (U.S. Sept. 29, 2016) (No. 15–1498)); *United States v. Castillo*, No. 15-0205 JH, 2016 U.S. Dist. LEXIS 58265, at *22–40 (D.N.M. May 2, 2016) (finding that Hobbs Act conspiracy does not constitute a crime of violence under § 924(c)'s force clause because "it does not contain an element that the conspiratorial agreement itself requires the use or attempted use of force or a communicated threat" and that "the lack of an overt act element in the charged conspiracy offense disqualifies the offense from being a crime of violence within the meaning of the residual clause, even though the object of the conspiracy itself is a crime of violence").

furtherance of the conspiracy . . . the defendant can be held liable as if he himself carried or used the firearm."); *Mingo*, 237 F. App'x at 865–66 (citing *United States v. Dickey*, 102 F.3d 157, 164 n.8 (5th Cir. 1996)).

The charges in Counts Six and Twelve arise out of two different types of underlying charges, each of which could have been a separate basis for those counts. First, the charges of robbery affecting interstate commerce in Counts Five and Eleven may serve as a basis for establishing the offenses in Counts Six and Twelve, respectively, or the conspiracy to commit robberies charged in Count One may also serve as the basis for Counts Six and Twelve. (*Id.* at 28, 29 ("Under this second basis, a member of a conspiracy who commits another crime during the existence or life of a conspiracy and commits this other crime in order to further or somehow advance the goals or objectives of the conspiracy, may be found by [the jury] to be acting as the agent of the other members of the conspiracy. The illegal actions of this person in committing this other crime may be attributed to other individuals who are then members of the conspiracy.").) *See also Pinkerton*, 328 U.S. at 645–46. As such, if the Government proved beyond a reasonable doubt that a co-conspirator used or carried a firearm during the commission of a robbery that was the object of the Hobbs Act conspiracy charged in Count One of the Indictment, then the jury may find Gillespie guilty as to Counts Six and Twelve.[20] (*See* ECF No. 656 at 28.) The jury found

---

[20] Even if conspiracy to commit Hobbs Act robbery as charged in Count One of the Indictment is not a crime of violence, *Pinkerton* liability allows a finding of guilt as to Counts Six and Twelve based on the conduct of Gillespie's co-conspirators during the robberies alleged in Counts Five and Eleven. The *Pinkerton* doctrine provides that if Gillespie conspired to commit Hobbs Act robbery and subsequently aided and abetted his co-conspirators' violation of § 924(c) "when their commission is reasonably foreseeable and in furtherance of the conspiracy," then he will also be liable for that substantive offense. *See United States v. Hare*, 820 F.3d 93, 105 (4th Cir. 2016); *Ashley*, 606 F.3d at 142–43. The Court already concluded that sufficient evidence existed for Gillespie's conviction on Count One. In furtherance of that conspiracy, it was reasonably foreseeable that his co-conspirators would use or carry firearms when committing the Kanawha City and Dunbar robberies referenced in Counts Five and Eleven of the Indictment. (*See* ECF No. 418 at 10, 17.) Those substantive Hobbs Act robberies are crimes of violence, *see supra* note 6, and the evidence shows both that they were committed in furtherance of the conspiracy detailed in Count One and that

Gillespie guilty of the offenses charged in Counts One, Five, and Eleven, (ECF No. 658 at 1, 3, 6–7), and the Court noted above that there was sufficient evidence for a finding of guilt as to these charges.

During the robbery in Kanawha City around December 13, 2011, Barcliff testified that all four participants were armed.   (ECF No. 631 at 27 ("I believe everybody had a gun on them.").) However, during Glenn's testimony as to this robbery, the Government asked, "And do you know who all else had weapons?"   (ECF No. 632 at 38.)   Glenn said, "Barcliff had a gun and Brandon [Davis] had a gun.   [Gillespie] didn't have one not -- not that I can remember."   (*Id.* ("Q: You can't remember him having one at this occasion?   A: No."); *see also* ECF No. 683 at 25 (Davis test.) ("Q: Did anybody have firearms? . . . A: Robert [Barcliff] and Keith [Glenn] had them and, before we went in, though, they handed one off to me.").)   Davis corroborated Glenn's testimony by stating that he, Barcliff, and Glenn had firearms before entering the apartment and that Gillespie knew about the guns.   (ECF No. 683 at 25–26 ("Q: Could Defendant Gillespie have seen your firearm as you went into the apartment?   A: Yes.   Q: How would he know you had one?   A: Because I went in first.").)   The victim of that crime, Dues, confirmed during his testimony that "four guys came into [his] house with guns pointed at [him]."   (ECF No. 682 at 183, 184 (noting that one of the assailants struck him in the head with the butt of a gun).)   The Court finds that sufficient evidence was provided at trial to find that even if Gillespie himself did not carry a firearm during the December 13, 2011, robbery in Kanawha City, his co-conspirators carried and brandished firearms during the robbery.

---

Gillespie's co-conspirators at least carried firearms during their commission.   Thus, Gillespie may be convicted on Counts Six and Twelve under *Pinkerton* regardless of whether Count One itself is a crime of violence because he is liable for these types of substantive offenses committed by his co-conspirators.

Further, as to the Dunbar robbery, Glenn testified that all three co-conspirators had guns when they went to the victim's apartment.  (*See* ECF No. 635 at 24–25 ("Q: [Gillespie] had a handgun?  A: Yes . . .  Q: How is it that you know that they each had handguns?  A: Because we -- we put them in the car.").)  Davis stated that he and Glenn had firearms when they traveled to the Dunbar apartment complex.  (ECF No. 683 at 71.)  While this testimony may be contradictory as to whether Gillespie himself was carrying a firearm, no conflicting evidence was presented at trial suggesting that firearms were not taken to the Dunbar robbery.  *Cf. Mitchell*, 104 F.3d at 653–54 ("A defendant actually possessing a firearm and conveying it on his person—either in his hand, his clothing, or in a satchel he is holding—during a drug transaction is perhaps the clearest example of a violation of the 'carry' prong of § 924(c)(1).")  Lieutenant Foster stopped Gillespie's car, which was the subject of the BOLO alert issued by the Dunbar Police Department following its response to the scene of the Dunbar robbery.  (*See* ECF No. 759 at 136–40.)  As detailed below in relation to Count Ten, a search warrant was issued for the car, and Captain Elliot recovered multiple firearms and ammunition from the vehicle.  (*See* ECF No. 758 at 144–58.)  The Court finds that sufficient evidence was provided to find that firearms were at least carried during the Dunbar robbery.  Like the Kanawha City robbery, this robbery in Dunbar was charged as part of the overarching conspiracy to commit Hobbs Act robbery in Count One of the Indictment.  (ECF No. 418 at 4–5.)

As indicated above and in the jury instructions, which Gillespie did not oppose at trial, "a co-conspirator's § 924(c)(1) violation 'may be imputed to other members of the conspiracy.'"  *See United States v. Cummings*, 937 F.2d 941, 944–45 (4th Cir. 1991) (quoting *United States v. Diaz*, 864 F.2d 544, 548 (7th Cir. 1988)); *see also United States v. Hare*, 820 F.3d 93, 105 (4th Cir.

64

2016) (noting that the jury was properly instructed on *Pinkerton* liability and that evidence amply demonstrated reasonable foreseeability to defendants that a co-conspirator would possess a firearm in violation of § 924(c)); *United States v. Ledbetter*, 381 F. App'x 292, 296–97 (4th Cir. 2010) ("A defendant may be convicted of a § 924(c) charge on the basis of a coconspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant." (quoting *United States v. Wilson*, 135 F.3d 291, 305 (4th Cir. 1998))).  Following this Fourth Circuit precedent, the jury was instructed that the use of a firearm by one of Gillespie's co-conspirators in furtherance of the conspiracy to rob drug dealers could serve as a basis for Counts Six and Twelve.  (*See* ECF No. 656 at 29.)  The evidence set forth above shows that even if Gillespie himself did not possess a firearm during the substantive Hobbs Act robberies, his co-conspirators did.  The Court finds that the evidence supporting the overarching conspiracy also demonstrates that the use of firearms during the Kanawha City and Dunbar robberies was reasonably foreseeable.  As such, based on the actions of Gillespie and particularly his co-conspirators, the Court finds that sufficient evidence existed for the jury's verdict as to Counts Six and Twelve, and the interests of justice do not require a new trial on this basis.

Lastly, Count Ten, charging Gillespie with possessing, concealing, and storing stolen firearms and ammunition in violation of 18 U.S.C. § 922(j), requires proof of the following three elements:

First:     That the defendant knowingly possessed, concealed, or stored the firearms or ammunition described in Count Ten of the Indictment;

Second:     That the defendant knew or had reasonable cause to believe the firearms or ammunition were stolen; and

Third:     That the firearms or ammunition moved or were shipped in interstate commerce before or after being stolen.

65

(ECF No. 656 at 33.)   In relation to the third element, the Government need not have proven that Gillespie had any involvement in the shipping or transportation of the firearms or ammunition, or that the firearms or ammunition were stolen at the time they were transported in interstate commerce.   (*Id.*)   Based on the Indictment, Gillespie must have knowingly possessed, concealed, or stored any one or more of the following identified stolen firearms and ammunition:

   a.   Chinese manufactured Model 56-1, AK-47 replica, 7.62 x 39 mm caliber firearm;

   b.   Winchester model 25 12-gauge shotgun;

   c.   Kel-Tec Model PF9, 9 mm Luger semi-automatic pistol;

   d.   Kel-Tec PLR-16 semi-automatic pistol; and

   e.   Ammunition, including numerous rounds of 9 mm and 7.62 mm ammunition and 12 gauge shotgun rounds.

(*Id.* at 34.)   Count Ten also charged the alternative crime of aiding and abetting the possession, concealment, and storing of stolen firearms and ammunition in violation of 18 U.S.C. § 2.   (ECF No. 418 at 15–16.)   The Indictment charged that Gillespie, Barcliff, Davis, and Glenn aided and abetted each other in the commission of an offense in violation of 18 U.S.C. § 922(j).   (*Id.* at 15.) The elements required to prove the aiding and abetting charge were laid out above in relation to Counts Five and Eleven.

Barcliff testified as to a robbery committed in Bristol, Virginia, by him, Glenn, Davis, and Gillespie, on March 22, 2012.   (*See* ECF No. 631 at 65–72.)   The goal of the robbery, according to Glenn, was to acquire cocaine or other drugs.   (ECF No. 635 at 4.)   According to Barcliff, Gillespie drove his Dodge Charger to the site of the robbery on March 21, 2012, and the four participants staked out the house all night before committing the robbery the next morning.   (ECF

No. 631 at 66, 68.)   The victim, Nicholas Hammit ("Hammit"), stated that he was sitting on his house's porch with a friend when three men approached him asking to purchase marijuana.   (ECF No. 758 at 11.)   After telling them that he would smoke with them, the men came onto his porch and one of them pepper sprayed him in the face.   (*See id.*)   Glenn testified that once on the porch, Barcliff pulled a gun on Hammit and his friend, and Davis pepper sprayed them.   (ECF No. 635 at 7.)   After a struggle between one of the victims and Barcliff and Glenn, zip-ties were put on both of the victims.   (*See id.* at 7–8.)

Hammit said that in the approximately five minutes during which the men were in his house, they took several firearms, cocaine, marijuana, money, and a digital camera.   (ECF No. 758 at 12, 14–20 (identifying several firearms and ammunition that belonged to him)).   Glenn testified that a Kel Tec 9 mm handgun with laser site was taken off the hip of one of the victims, (*see* ECF No. 635 at 8), and a 12-gauge shotgun, PRL-22, AK-47, and ammunition for all of those firearms in "Army containers" and medicine pill bottles were found in another room.   (*See id.* at 9–10.)   Barcliff stated that Gillespie came inside the house after the victims were zip-tied, and Gillespie helped carry from inside the house to the car "an AK-47, a 12-gauge shotgun, a couple glock handguns, some ammunition, a military knife, [and] a little bit of cocaine . . . ."   (ECF No. 631 at 71.   *See also* ECF No. 635 at 12; ECF No. 683 at 46 (Davis test.) ("Q: Did you get any other item from this robbery? . . . A: A whole bunch of guns, a lot of just Army stuff, knives, machetes, or whatever, yeah, clips and stuff like that.").)

Gillespie then proceeded to drive his car with the items inside from Virginia back to Charleston, West Virginia, where the weapons, according to Barcliff, Glenn, and Davis, were unloaded at Cutlip's house and divided between the four participants.   (*See* ECF No. 631 at 72–

73; ECF No. 635 at 12, 144 (Glenn test.) ("Q: And, in fact did you commit robbery on -- in Bristol, Virginia where you stole a lot of firearms?   A: Yes, sir.   Q: And did you bring those firearms back into the State of West Virginia?   A: Yes, sir."); ECF No. 683 at 47 (Davis test.) ("Q: What did you do with the items that you took from the Bristol house when you got to [Cutlip's]?   A: We took them all down to the basement and pretty much figured out who was going to get what.").) The prosecution further asked Barcliff about the pill bottles that were taken from the house in Bristol, (*see* ECF No. 631 at 93–94), and he confirmed that the pill bottles containing ammunition from the robbery in Bristol were transported back to West Virginia.   (*Id.* at 94.)   Barcliff and Glenn testified that Gillespie claimed the Kel Tec 9 mm with laser site during the distribution of the fruits of the robbery.   (*Id.* at 77; ECF No. 635 at 17.   *See also* ECF No. 683 at 47–48 (Davis test.) ("Q: What did Defendant Gillespie get?   A: Hand gun, pistol.").)   The Government admitted into evidence during Barcliff's testimony a 12-gauge shotgun; AK-47; PRL automatic; a handgun; a picture of "[s]ome slugs, ammunition, military knife," and a shotgun; and a picture of "an AK-47, three clips, and the carrying bag"—all of which Barcliff, Glenn, and Davis identified and confirmed came from the robbery in Bristol.   (*See* ECF No. 631 at 73–77; *see also* ECF No. 635 at 10–11; ECF No. 683 at 48–52).)

Witness testimony at trial also revealed that Gillespie planned to transport the guns from West Virginia back to Virginia after the Dunbar robbery.   (*See* ECF No. 683 at 78 (Davis test.) ("Q: What was the plan to get back to Wyth[e]ville?   A: The plan to get back to Wyth[e]ville? Q: How were you going to get back?   A: [Gillespie] was going to take us.   Robert [Barcliff] was going to stay in Charleston.   Q: What were you going to do with the firearms that you had stolen in Bristol?   A: Well, at first, we was just going to keep it at [Cutlip's], but Keith [Glenn] just kept

68

insisting he wanted to take his with him.   I figured we were going to ride with one guy, we might as well, so I took mine and he took his, as well.").)   After the Dunbar robbery on March 22, 2012, and before leaving for Wytheville later that night, Davis testified that the stolen weapons were moved from the trunk of Cutlip's car to Gillespie's car.   (*See* ECF No. 683 at 79 ("Q: Where were the firearms in Defendant Gillespie's car?   A: The pump, the shotgun, and the -- the other one, the A.K., were in the trunk, but [Gillespie] kept a handgun on him.").)   The stolen firearms were still in the trunk of the vehicle at the time that Gillespie, Glenn, and Davis, were arrested.   (*See* ECF No. 683 at 181 (Davis test.) ("Q: . . . you were actually arrested in an automobile, right?   A: Right, right.   Q: And arrested in the automobile where you had a stolen shotgun . . . a stolen AK-47 machine gun . . . [and] a stolen pistol; is that right?   A: Yes, sir.").)   As discussed above, the red Dodge Charger was stopped because of the BOLO alert issued following the Dunbar robbery. Captain Elliot testified at trial as to the items that were found in Gillespie's Dodge Charger when it was taken to an evidence processing room at the Kanawha County Sheriff's Department and searched pursuant to a search warrant.   (*See* ECF No. 758 at 144–58.)   The serial numbers from the weapons taken from the car were compared to those listed on the search warrant.   (*Id.* at 146.) Captain Elliot recovered from the vehicle a glock pistol and magazine, an AK-47, a shotgun with several rounds of ammunition, a Kel Tec 9 mm, a Kel Tec PLR-16 and magazine, and a Hi-Point firearm.   (*See id.* at 144–58.)

    The Court finds that Gillespie knowingly possessed, concealed, and stored the firearms and ammunition described in Count Ten of the Indictment.   This evidence was proven up through testimony and the recovery of the firearms and ammunition from Gillespie's vehicle.   Because Gillespie participated in the conspiracy and, according to testimony, helped steal the weapons from

the Bristol, Virginia, residence, (*see* ECF No. 31 at 71 (Barcliff test.)), Gillespie knew that they were stolen.   Further, the evidence shows that the firearms and ammunition were driven from Virginia back to Cutlip's house in West Virginia.   Testimony also provided that the firearms and ammunition were in transport back to Virginia at the time Gillespie's car was stopped subject to the BOLO alert.   Sufficient evidence existed for a conviction as to Count Ten, and a new trial is not warranted on this basis.

The Court finds sufficient evidence to convict Gillespie on Counts One, Two, Five, Six, Ten, Eleven, Twelve, and Fourteen of the Indictment.   To grant a new trial despite the aforementioned evidence would constitute an abuse of the Court's discretion.   *See Souder*, 436 F. App'x at 289.   Despite the fact that much of the testimony at trial came from former co-defendants who entered into plea agreements with the Government, the testimony elicited by the Government is plausible, convincing, and supportive of the verdicts as to each of the counts.   *See Cabrera*, 734 F. Supp. 2d at 90.   Thus, the Court does not find that a new trial is appropriate because the evidence proved at trial supports the jury's verdict.

C. *Johnson and Gillespie's Supplemental Motions*[21]

The supplemental motions were filed following the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015).   In that case, the Supreme Court held the residual clause in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), to be unconstitutionally vague.   *See* 135 S. Ct. at 2557–58, 2559–60.   Defendants Johnson and Gillespie argue here that Hobbs Act conspiracy is not a crime of violence under the force clause

---

[21] Johnson filed his Supplemental Motion for Judgment of Acquittal or, in the Alternative, for a New Trial on July 7, 2016, (ECF No. 801), and Gillespie filed his Supplemental Motion[ ] for New Trial or Judgment of Acquittal on July 27, 2016, (ECF No. 815) (collectively, "the supplemental motions").   Because Johnson and Gillespie premise the supplemental motions on an identical theory, the Court will address them concurrently.

of § 924(c)(3)(A) because "the offense may be accomplished by a mere agreement to commit robbery which does not require violent physical force," or under the residual clause of § 924(c)(3)(B) because "[t]he statutory phrase at issue in § 924(c) . . . is essentially the same as the ACCA."  (*See* ECF No. 801 at 4–8, *adopted in* ECF No. 815 at 1–2.)   If Hobbs Act conspiracy is not a crime of violence, Defendants argue, it cannot serve as a predicate "crime of violence" for their convictions on Count Two, and Gillespie argues further that the convictions based on Counts Six and Twelve of the Indictment, charging him with using firearms in a crime of violence, similarly must be vacated.  (*See* ECF No. 801 at 2–3 & 2 n.1; ECF No. 815 at 4–9.)   Finally, Gillespie moves to supplement his original Motion for New Trial, (ECF No. 765), on the ground that "the use of the special verdict form violated [his] right to due process: procedural, substantive, or both."  (ECF No. 815 at 13–14.)

The Government responds that "[t]he 'residual clause' of § 924(c)(3)(B) materially differs from the portion of the ACCA that was struck down in *Johnson*, and so should not be similarly invalidated."  (ECF No. 816 at 3, 10–15; ECF No. 821 at 17–22.)   It argues that both Hobbs Act robbery and conspiracy to commit Hobbs Act robbery qualify as crimes of violence under the force clause in § 924(c)(3)(A), "which was unaffected by *Johnson*."  (*See* ECF No. 816 at 3, 4–10; ECF No. 821 at 5–17.)   Further, the Government claims that Defendants cannot present a vagueness challenge to the residual clause in § 924(c) because it is not vague as applied to Defendants in this case.  (*See* ECF No. 816 at 15–16; ECF No. 821 at 22–23.)   As to Gillespie's argument that the special verdict form violated his due process, the Government responds that this ground is "clearly time-barred" under Federal Rule of Criminal Procedure 33 because there has been no change to the law supporting the use of special verdict forms that would allow for a filing of a late motion

71

on this ground.   (*See* ECF No. 821 at 24–25.)

In Defendants' memoranda of law filed in response to this Court's order entered after the motions hearing held on August 30, 2016, (ECF Nos. 826, 827), Johnson and Gillespie both concede that they did not raise any objection during trial regarding either clause of 18 U.S.C. § 924(c)(3).   (*See* ECF No. 833 at 2; ECF No. 834 at 1.)   Further, Johnson states that his supplemental motion is brought under both Federal Rules of Criminal Procedure 29 and 33, (ECF No. 834 at 2), while Gillespie avers that "[a] motion for new trial under Rule 33 is the better procedural vehicle in this case," (ECF No. 833 at 2–3).   In response to the Court's inquiry about the proper standard to employ when reviewing the supplemental motions, Johnson states that a new trial is appropriate "where the 'interests of justice' so require even where defendant failed to object to the error at trial."   (*See* ECF No. 834 at 3–4 (citing *United States v. Sardesai*, No. 96-4228, 1997 WL 626540, at *5 n.8 (4th Cir. Oct. 10, 1997) (internal citation omitted)).)   Johnson reincorporates the standard for a Rule 29 motion as argued in his original motion.   (*See id.* at 3 n.2, 7.)   Johnson also argues that even if the Court finds that the plain error standard is applicable to the supplemental motions, "it cannot reasonably be said that it is not plain error to find the Hobbs Act [r]obbery conspiracy constitutes a crime of violence."   (*Id.* at 6.)   Gillespie admits that "[h]owever the defense post-trial motions are best characterized, the lack of a contemporaneous objection implicates [Rule] 52."   (*See* ECF No. 833 at 3–6.)   Lastly, Johnson argues that if a portion of the jury instructions are rendered incorrect by subsequent law, the Court should ascertain what evidence the jury credited in convicting them because "when a jury is presented with two possible options for conviction and one is constitution[al] and the other is not, the verdict must be set aside where it is impossible to tell the basis of the jury's verdict."   (ECF

No. 834 at 7–8 (citations omitted).)   Gillespie states in a conclusory fashion that the remedy for giving an instruction providing that conspiracy to commit Hobbs Act robbery is a crime of violence requires a new trial.   (ECF No. 833 at 2.)

The Government's supplemental memoranda of law endorse Defendants' admission that no objection was raised at trial regarding either clause of § 924(c)(3).   (ECF No. 835 at 1; ECF No. 836 at 1.)   Further, the Government characterizes the supplemental motions as Rule 29 motions for judgment of acquittal because of the remedy that both Defendants seek within the supplemental motions.   (ECF No. 835 at 2; ECF No. 836 at 2.)   The Government argues that plain error review is the standard governing the supplemental motions.   (ECF No. 835 at 2–3 (citing *United States v. Fuertes*, 805 F.3d 485, 497 (4th Cir. 2015)); ECF No. 836 at 2–3.)   It further avers that even if the Court were to find that the jury instructions indicating that conspiracy to commit Hobbs Act robbery is a crime of violence was in error, Defendants "would not be able to meet the plain error standard because [they] could not show that the error affected the outcome of the trial."   (*See* ECF No. 836 at 7–11; ECF No. 835 at 7–9.)

Parties must object to any proposed jury instruction with which they disagree before the jury retires to deliberate.   Fed. R. Crim. P. 30(d).   Failure to object precludes review "except as permitted under Rule 52(b)."   *Id.*   Federal Rule of Criminal Procedure 52(b) states that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention."   While commonly employed by appellate courts, "Rule 52 governs disposition of post-trial motions at the district court level."[22]   *United States v. Goldstein*, 986 F. Supp. 833, 842 n.19

---

[22] This Court, like many other district courts, has applied the plain error standard when reviewing post-trial motions, particularly when criminal defendants challenge a jury instruction for the first time in a post-trial motion.   *See United States v. Stover*, No. 5:11–cr–00038, 2012 WL 638787, at *7–8 (S.D. W.Va. Feb. 27, 2012) (alleging prosecutorial misconduct for the first time in a post-trial motion); *United States v. Lecco*, 634 F. Supp. 2d 633, 655–56 (S.D. W.

(D. De. 1973).   *See also Herzog v. United States*, 226 F.2d 561, 569–70 (9th Cir. 1955), *adhered to on rehearing*, 235 F.2d 664, *cert. denied*, 352 U.S. 844 (1956) (interpreting Rule 52(b) under its previously worded construction to mean that both trial and appellate courts may use the plain error standard).   "When a defendant fails to object to a jury instruction, *even if there were no legal grounds for challenging the instruction at the time it was given*, a district court should deny a motion for a new trial in the absence of plain error."   *United States v. Sprouse*, 517 F. App'x 199, 204 (4th Cir. 2013) (emphasis added).   *See also United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) ("The plain error principle applies even where, as here, the error results from a change in the law that occurred while the case was pending on appeal."); *United States v. Riley*, 90 F. Supp. 3d 176, 185 (S.D.N.Y. 2015) ("Plain error review applies equally where the defendant did not object . . . because he failed to recognize an error, and where the defendant did not object because the trial court's [charge] was correct at the time but assuredly became erroneous due to a supervening legal decision.") (citations omitted); *United States v. Perry*, No. 2:13cr156, 2014 WL 7240236, at *1 (E.D. Va. Dec. 19, 2014) ("Although the parties in the instant case were afforded an opportunity to review and object to the Court's proposed jury instructions, neither the Government nor the Defendant objected . . . Such instruction is therefore subject to 'plain error'

---

Va. 2009) ("The Rule is thought by many to have application only in an appellate setting.   The decisions are not unanimous on that point." (citations omitted)); *see also United States v. Riley*, 90 F. Supp. 3d 176, 185 (S.D.N.Y. 2015) (raising an objection to the court's jury instructions for the first time in a post-trial motion); *United States v. Lawson*, No. 1:13–CR–4–TLS, 2014 WL 4209372, at *6–7 (N.D. Ind. Aug. 26, 2014) (same); *United States v. Adigun*, 998 F. Supp. 2d 356, 363 (M.D. Pa. 2014) (same); *United States v. Nero*, No. 12–141, 2013 WL 6044362, at *10 (E.D. La. Nov. 14, 2013) ("The objections Defendants now make were never raised at trial, despite the several opportunities this Court gave the parties to provide input.   This fact is important to note because the Supreme Court has determined that even serious constitutional errors can be forfeited by a defendant's failure to object."); *United States v. Clarke*, 767 F. Supp. 2d 12, 24 (D.D.C. 2011); *United States v. Heron*, 525 F. Supp. 2d 729, 751 n.48 (E.D. Pa. 2007) ("Although plain error analysis is usually the province of the Court of Appeals, the Rule—which is contained in the Federal Rules of Criminal Procedure, not the Federal Rules of Appellate Procedure—is not limited to appellate practice."), *rev'd on other grounds*, 323 F. App'x 150 (3d Cir. 2009).

review." (citation omitted)).

Regardless of whether a challenge to a jury instruction that was not raised at trial is brought under a Rule 29 motion for judgment of acquittal or Rule 33 motion for new trial, the standard applied by the Court is determined not by the title of the motion but rather the argument within it. *See Fuertes*, 805 F.3d at 497; *see also United States v. Colvard*, No. 1:13–CR–109, 2015 WL 5123893, at *14 (M.D. Pa. Sept. 1, 2015) (reviewing the defendant's claim regarding an erroneous jury instruction that was not raised at trial under the plain error standard despite the fact that the argument was presented in a Rule 29 motion for judgment of acquittal).   In *Fuertes*, the appellant asserted in a motion for judgment of acquittal that his conviction under § 924(c)(3) was based on insufficient evidence because a jury instruction providing that sex trafficking was a crime of violence was faulty.   805 F.3d at 497.   The court applied the plain error standard because the appellant did not object to the instruction or raise the argument at trial, and his objection was "not about factual or evidentiary sufficiency; rather, his argument [was] a purely legal one."   *See id.* Ultimately, the Fourth Circuit found plain error based on clear Supreme Court precedent.   *Id.* at 500–01.   Like the Fourth Circuit in *Fuertes*, other circuits have also held that a jury instruction that "omits or significantly misstates an essential element of an offense . . . may be severe enough to meet the plain-error standard."   *See United States v. DeLeon*, 484 F. App'x 920, 928–30 (5th Cir. 2012) (citations omitted); *see also United States v. Semrau*, 693 F.3d 510, 526–28 (6th Cir. 2012); *United States v. Javell*, 695 F.3d 707, 713–14 (7th Cir. 2012).

The Supreme Court in *United States v. Olano* pronounced the familiar rule now used when courts evaluate an alleged plain error at trial.   507 U.S. 725, 732–35 (1993) (relying on its previous decisions in *United States v. Young*, 470 U.S. 1, 15 (1985), and *United States v. Atkinson*, 297 U.S.

157, 160 (1936)).   The Court described three limitations to reviewing authority under Rule 52(b). *See id.*   First, there must be an "error."   *Id.* at 732–33.   Second, that error must be "plain," "clear," or "obvious," under current law.   *Id.* at 734 (citing *Young*, 470 U.S. at 14 n.14; *United States v. Frady*, 456 U.S. 152, 163 (1982)).   Finally, the plain error must affect the defendant's substantial rights.   *Id.* at 734–35.   In addition to these three limitations, the Court stated that defendants must satisfy the *Atkinson* standard under which a plain error affecting substantial rights should be corrected only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."   *Id.* at 732, 736–37 (citing *Atkinson*, 297 U.S. at 160).   Thus, a defendant asserting a plain error faces a demanding burden of demonstrating fundamental injustice.   *See United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir. 2003) (quoting *Olano*, 507 U.S. at 732) (noting that even if a defendant meets his burden of showing that a plain error affected his substantial rights, the error may still be ignored if the *Atkinson* standard is not met).

The rule from *Olano* was updated and newly synthesized by the Supreme Court almost two decades later in *United States v. Marcus*, 560 U.S. 258, 262 (2010) (noting that "[l]ower courts, of course, must apply [Rule 52(b)] as this Court has interpreted it").   There, the Court provided that an error not raised at trial may only be corrected where the objector "demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the [objector's] substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"   *Id.* (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009); *Olano*, 507 U.S. at 731–37; *Johnson v. United States*, 520 U.S. 461, 466–67 (1997); *United States v. Cotton*, 535 U.S. 625, 631–32 (2002)).   *See also United States v.*

*Clarke*, 767 F. Supp. 2d 12, 24 (D.D.C. 2011) ("The defendant bears the burden of proving each element of the plain error standard."). "As the Supreme Court has repeatedly made clear, '[m]eeting all four prongs is difficult, as it should be.'" *United States v. Johnson*, 529 F. App'x 362, 369 (4th Cir. 2013) (quoting *Puckett*, 556 U.S. at 135) (internal quotation marks and citation omitted). While a court may correct a plain error, it is not required to do so. *See Riley*, 90 F. Supp. 3d at 185 (citations omitted); Fed. R. Crim. P. 52(b).

For an error to be "clear or obvious" as required by the second prong of the plain error test, the law justifying the asserted error must be settled. *See Perry*, 2014 WL 7240236, at *7 ("Based on the uncertain nature of the law, even if the instruction given in this case was erroneous, such error is not 'clear or obvious' . . . ."). For example, plain error is easily established where a defendant does not object to a trial court's allowance of "multiple prosecutions against a single defendant for the same offense" in violation of the Double Jeopardy Clause. *See United States v. Jarvis*, 7 F.3d 404, 412–13 (4th Cir. 1993). "[Rule 52(b)'s] requirement that an error be 'plain' means that lower court decisions that are questionable but not *plainly* wrong (at the time of trial or at time of appeal) fall outside the Rule's scope." *Henderson v. United States*, 133 S. Ct. 1121, 1130 (2013) (emphasis in original). *See also Riley*, 90 F. Supp. 3d at 185 (citations omitted) ("The existence of 'error' and 'plain error' are not coextensive."). Regardless of the state of the law at the time of trial, it is enough that an error be "plain" at the time of reconsideration. *See Johnson*, 520 U.S. at 467–68 (considering a trial court's decision that was clearly correct at the time it was made but was obviously erroneous after an intervening authoritative legal decision); *see also Henderson*, 133 S. Ct. at 1130 ("[T]he fact that a defendant did not object, despite unsettled law, may well count against the grant of Rule 52(b) relief. Moreover, the problem here arises only

when there is a new rule of law, when the law was previously unsettled, and when the District Court reached a decision contrary to the subsequent rule.").

This Court is responsible for ensuring that the jury instructions represent an accurate statement of the law. *See, e.g.*, *Noel v. Artson*, 641 F.3d 580, 584 (4th Cir. 2011). Here, neither party objected to the Court's jury instructions regarding the "crime of violence" definition within § 924(c). (*See* ECF No. 815 at 13; ECF No. 833 at 2; ECF No. 834 at 1.) At the time the Court instructed the jury on January 27, 2015, the Supreme Court had not issued its opinion in *Johnson*, which is the basis of the supplemental motions. *See* 135 S. Ct. at 2551 (decided June 26, 2015). However, the parties could have, and arguably should have, known that a decision in that case was impending as the *Johnson* Court heard oral arguments on November 5, 2014. *See id.* Nevertheless, the parties did not object to this jury instruction, and the charge was published accordingly.

Notwithstanding the titles of the supplemental motions, the substance of the arguments within are purely legal and do not involve the sufficiency of the evidence. The plain error standard is an appropriate vehicle to review the supplemental motions because the *Johnson* issue was not raised at trial, and the possibility that this jury instruction was incorrect has serious consequences on the jury's deliberation and its verdicts as to Counts Two, Six, and Twelve of the Indictment. *See United States v. Stover*, No. 5:11–cr–00038, 2012 WL 638787, at *8 (S.D. W.Va. Feb. 27, 2012) ("'Only if in the context of the proceedings taken as a whole, the error either led to the conviction of a defendant who is actually innocent or otherwise seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' should the Court notice a plain error as a grounds for granting the motion." (quoting *United States v. Cedelle*, 89 F.3d 181, 185 (4th

78

Cir. 1996))). Therefore, Johnson and Gillespie must demonstrate that a clear or obvious error

affected both the outcome of the trial and "the fairness, integrity or public reputation of judicial

proceedings." *See Marcus*, 560 U.S. at 262.

The jury instructions here relating to Count Two provided the following:

Count Two charges defendants Jamaa I. Johnson and Darrell E. Gillespie with a violation of Title 18, United States Code Section 924(o), which makes it a crime for anyone to conspire to commit offenses in violation of 18 U.S.C. § 924(c), that is, to knowingly use and carry a firearm during and in relation to a crime of violence for which he could be prosecuted in a court of the United States, including robberies affecting interstate commerce and conspiracy to commit such robberies in violation of 18 U.S.C. § 1951.

(ECF No. 656 at 23–24.) Within the "statutes" section of the jury instructions, the Court

advised the jury of the following:

Section 924(c)(3) further provides:

(3) For the purposes of this subsection the term "crime of violence" means an offense that is a felony and--

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

(*Id.* at 18.) Other than providing the statutory definition within § 924(c) for a crime of violence,

the Court did not provide further explanation for the jury's consideration.

The Supreme Court in *Johnson* addressed the constitutionality of the residual clause in the

ACCA. *See* 135 S. Ct. at 2555–56 (quoting 18 U.S.C. § 924(e)(2)(B)). While there is no

disagreement among courts that the Supreme Court held the residual clause to be void for

vagueness, *see id.* at 2563, courts have floundered with the precise rationale the Supreme Court

utilized.  In finding a violation of the Fifth Amendment's Due Process Clause, Justice Scalia

stated that "the indeterminacy of the wide-ranging inquiry required by the residual clause both

denies fair notice to defendants and invites arbitrary enforcement by judges."  *Id.* at 2557.  After

detailing a few specific uncertainties contained in the ACCA's residual clause, the majority

opinion provided that while "[e]ach of the uncertainties in the residual clause may be tolerable in

isolation, . . . 'their sum makes a task for use which at best could only be guesswork.'"  *Id.* at 2560

(quoting *United States v. Evans*, 333 U.S. 483, 495 (1948)).

The ACCA, which was at issue in *Johnson*, provides, in pertinent part, that "a person who

violates section 922(g) . . . and has three previous convictions by any court referred to in section

922(g)(1) of this title for a violent felony or a serious drug offense, committed on occasions

different from one another," is subject to a mandatory minimum term of imprisonment of fifteen

years.  18 U.S.C. § 924(e)(1).  Notably, the ACCA provides the following definition of the term

"violent felony" for purposes of that provision:

> [T]he term "violent felony" means any crime punishable by imprisonment for a
> term exceeding one year, or any act of juvenile delinquency involving the use or
> carrying of a firearm, knife, or destructive device that would be punishable by
> imprisonment for such term if committed by an adult that—
>
> (i)  has as an element the use, attempted use, or threated use of physical force
> against the person of another; or
>
> (ii)   is burglary, arson, or extortion, involves use of explosives, or *otherwise
> involves conduct that presents a serious potential risk of physical injury
> to another* . . . .

§ 924(e)(2)(B) (emphasis added).  The italicized language in subsection (ii) is the residual clause

that was the subject of the *Johnson* decision.  The subject of the pending supplemental motions

here is the residual clause under § 924(c), which as noted above provides a definition of the term

"crime of violence" to include an offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3). As is apparent from this language and the Government's argument at the October 7, 2016, motions hearing, (ECF Nos. 837, 838), "[t]he residual clause struck down in *Johnson* contains similar but not identical language to the residual clause . . . under 18 U.S.C. § 924(c)(3)(B)."[23] *United States v. Naughton*, 621 F. App'x 170, 178 n.4 (4th Cir. 2015).

Even assuming arguendo that *Johnson* applies to advise courts that the residual clause in § 924(c) is similarly void for vagueness, and, therefore, this Court erred in instructing the jury as to the "crime of violence" language in § 924(c)(3), the error is not plain. The Fourth Circuit has not addressed on the merits [24] whether the *Johnson* decision also renders § 924(c)(3)(B) unconstitutionally vague.[25] This issue was brought before the Fourth Circuit in *United States v.*

---

[23] While the language of § 924(c)(3) is notably different from the ACCA's language analyzed in *Johnson*, the language in § 924(c)(3) is identical to the definition of a "crime of violence" provided in 18 U.S.C. § 16. Because the language used in these two statutes is identical, the Fourth Circuit has stated that "precedent respecting one" should be "treated" as "controlling analysis of the other." *In re Hubbard*, 825 F.3d 225, 230 n.3 (2016) (citations omitted).

[24] In *In re Hubbard*, the Fourth Circuit narrowly addressed whether *Johnson* potentially extends to the residual clause in U.S.S.G. § 4B1.2, which at the time of the petitioner's sentencing in 1989, "defined the term of 'crime of violence' by reference to 18 U.S.C. § 16." 825 F.3d at 230. The court noted that while the language in § 16(b) may be narrower than that in the ACCA, "this distinction between the ACCA residual clause and § 16(b), as presented by the government, goes more to the breadth of the two clauses than their vagueness," and does not alter the fact that the two provisions have similarities that go to the heart of the Supreme Court's "concern" regarding the ACCA residual clause. *Id.* at 233. Ultimately, the Fourth Circuit stated that "[t]he *Johnson* Court's focus was on the abstraction involved in analyzing an ordinary case, and the distinction the government has raised between these two provisions does not render it implausible that § 16(b), too, is unconstitutionally vague." *Id.* However, the Fourth Circuit left these "merit argument[s]" to the district court. *Id.*

[25] The Government pointed the Court to three cases regarding *Johnson*'s application to § 924(c)(3)(B) on which the Fourth Circuit heard oral arguments in September and October of last year. (ECF No. 821 at 3 n.1.) However, at the time of this memorandum opinion's issuance, the Fourth Circuit has not entered opinions in those cases and, thus, has not provided clarity as to the state of the law on this point.

 The same is true of *Dimaya v. Lynch*, which is a case where the Ninth Circuit found that *Johnson* applied to render the residual clause under § 16(b), which is incorporated in the Immigration and Nationality Act's definition of "aggravated felony," unconstitutionally vague. *See* 803 F.3d 1110, 1120 (9th Cir. 2015), *cert. granted*, 85 U.S.L.W. 3114 (U.S. Sept. 29, 2016) (No. 15–1498). The Supreme Court heard oral arguments on January 17, 2017, but as of this writing, the Court has not issued an opinion in that case. Due to the imminence of the Supreme Court's opinion in *Dimaya*, this Court recognizes that it may have to revisit this issue if *Dimaya* affects this memorandum opinion and order.

 As the Eastern District of Virginia pointed out earlier this year, "[t]he Fourth Circuit has not decided whether

81

*Graham*, and the Fourth Circuit concluded as this Court does today:

> We note that, after *en banc* oral argument, Defendants moved to file supplemental briefing on a new claim, based on *Johnson v. United States*, [135 S. Ct. at 2554]. Defendants argued, for the first time, that *Johnson*'s holding rendering 18 U.S.C. § 924(e) void for vagueness also renders void different language in § 924(c). We denied the motion as untimely. Even if we were to consider Defendants' late claim, however, it would not survive plain error review. *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013) ("An error is plain 'if the settled law of the Supreme Court or this circuit establishes that an error has occurred.'") This court has not yet addressed this claim, and our sister circuits have divided on the issue. *Compare United States v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015) (applying *Johnson* to find language identical to § 924(c) void for vagueness), *and Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (same), *with United States v. Taylor*, 814 F.3d 340, 375–79 (6th Cir. 2016) (declining to find § 924(c) void for vagueness after *Johnson*).

824 F.3d 421, 424 n.1 (4th Cir. 2016).

Other circuit courts, as the Fourth Circuit noted in *Graham*, are deeply divided as to whether *Johnson* rendered the residual clause under § 924(c)(3)(B) or the identical clause under § 16(b) unconstitutionally vague.[26] Further, district courts within this circuit are not in agreement

---

the language in the Section 924(c)(3) residual clause is void for vagueness after *Johnson*. The Fourth Circuit has had opportunities to rule on this issue, but has chosen not to address the question under the principle of constitutional avoidance." *Runyon v. United States*, No. 4:15cv108, 2017 WL 253963, at *44 (E.D. Va. Jan. 19, 2017) (citing *United States v. McNeal*, 818 F.3d 141, 152 n.8 (4th Cir. 2016); *United States v. Naughton*, 621 F. App'x 170, 178 n.4 (4th Cir. 2015); *United States v. Fuertes*, 805 F.3d 485, 499 n.5 (4th Cir. 2015)).

[26] *Compare United States v. Bluford*, No. 16-20288, 2017 WL 1244876, at *1 (5th Cir. Apr. 5, 2017) (per curiam) (finding that the defendant's claim that § 924(c)(3)(B) is unconstitutionally vague in light of *Johnson* was "foreclosed" because the Fifth Circuit "recently held that *Johnson* does not invalidate § 924(c)(3)(B)"), *and United States v. Robinson*, 844 F.3d 137, 140–44 (3d Cir. 2016) (affirming the defendant's conviction under § 924(c), which was premised on a Hobbs Act robbery, in light of *Johnson*), *and United States v. Pricket*, 839 F.3d 697, 698–700 (8th Cir. 2016) (holding that *Johnson* does not render § 924(c)(3)(B) unconstitutionally vague), *and United States v. Taylor*, 814 F.3d 340, 379 (6th Cir. 2016) (same), *and United States v. Gonzalez-Longoria*, 831 F.3d 670, 674–79 (5th Cir. 2016) (holding that § 16(b) is not unconstitutionally vague despite the *Johnson* decision), *and United States v. Hill*, 832 F.3d 135, 139–50 (2d Cir. 2016) (holding that § 924(c)(3)(B) is not unconstitutionally vague and that Hobbs Act robbery is a "crime of violence"), *with United States v. Cardena*, 842 F.3d 959, 995–96 (7th Cir. 2016) (extending the court's holding in *United States v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015), which held as unconstitutionally vague the residual clause in § 16(b), to invalidate the residual clause under § 924(c)(3)(B)), *and Baptiste v. Attorney General*, 841 F.3d 601, 615–21 (3d Cir. 2016) (holding that the Immigration and Nationality Act's residual definition of "crime of violence," which simply cross-references the residual clause in § 16(b), is unconstitutionally vague), *and Shuti v. Lynch*, 828 F.3d 440, 446–51 (6th Cir. 2016) (same), *and Golicov v. Lynch*, 837 F.3d 1065, 1069–75 (10th Cir. 2016) (same), *and Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (same), *cert. granted*, 85 U.S.L.W. 3114 (U.S. Sept. 29, 2016) (No. 15–1498).

on the issue although a majority decline to find that *Johnson* extends to § 924(c)(3)(B).[27]    Because neither the Supreme Court nor the Fourth Circuit has issued a decision on point, this Court cannot find that the law in this area is anything other than woefully uncertain.    Accordingly, even if an error were demonstrated in the Court's jury instruction regarding the "crime of violence" definition in § 924(c), it certainly is not a plain error.[28]    *See Fuertes*, 805 F.3d at 500–01; *see also United States v. Dortch*, 696 F.3d 1104, 1112–14 (11th Cir. 2012) ("An error is not obvious and clear when no Supreme Court decision squarely supports the defendant's argument, other circuits [ ] are split regarding the resolution of the defendant's argument, and we have never resolved the issue.").    Thus, the Court will not decide the merits of the *Johnson* argument because it suffices to say that there was no plain error committed at trial with regard to the jury instructions on § 924(c).    As such, the convictions based on Counts Two, Six, and Twelve are upheld.

Lastly, the Court does not find any merit in Gillespie's argument in his Supplemental

---

[27] *Compare Hernandez v. United States*, No. 10-CR-3173-H-3, 2016 WL 7250676, at *3 (S.D. Cal. Nov. 7, 2016) (holding that *Dimaya* does not control the constitutionality of § 924(c)(3)(B)), *and United States v. Moreno-Aguilar*, 198 F. Supp. 3d 548, 550–58 (D. Md. 2016) (holding that the residual clause under § 924(c) is not unconstitutionally vague), *and United States v. Clarke*, 171 F. Supp. 3d 449, 453–57 (D. Md. 2016) (same), *and Watson v. United States*, No. 2:16cv397, 2016 WL 4059218, at *2 (E.D. Va. July 25, 2016) (same), *appeal docketed*, No. 16-7228 (4th Cir. Sept. 13, 2016), *and United States v. Walker*, No. 3:15cr49, 2016 WL 153088, at *8–9 (E.D. Va. Jan. 12, 2016) (same), *and Harkum v. United States*, No. 1:16CV123, 2016 WL 5137417, at *3–4 (N.D. W.Va. Sept. 21, 2016) ("Even if Harkum's predicate offenses are 'crimes of violence' under § 924(c)(3)'s residual clause, this Court finds that § 924(c)(3)'s residual clause is not unconstitutionally vague after *Johnson*."), *appeal docketed*, No. 16-7536 (4th Cir. Nov. 3, 2016), *and United States v. McDaniels*, 147 F. Supp. 3d 427, 436–37 (E.D. Va. 2015) (stating that, "even if it were necessary to reach the question," § 924(c)(3)(B) survives *Johnson*), *with United States v. Bundy*, No. 2:16–cr–46–GMN–PAL, 2017 WL 449593, at *4–6 (D. Nev. Feb. 2, 2017) ("The *Dimaya* Court extended *Johnson* to a statute with language identical to [§ 924(c)(3)(B)], and it cannot be distinguished.    Therefore, this Court must reach the same conclusion and find § 924(c)'s Residual Clause unconstitutional."), *and United States v. Edmundson*, 153 F. Supp. 3d 857, 861–64 (D. Md. 2015) (holding that *Johnson* extends to invalidate the residual clause in § 924(c) as unconstitutionally vague).

[28] Insofar as the Supplemental Motions argue that Hobbs Act conspiracy is not a crime of violence, (*see* ECF No. 801 at 4–8), the Court does not find that the related jury instructions, (*see* ECF No. 656 at 24, 26, 29), result in a plain error on this basis.    The Court noted earlier in this memorandum opinion that sufficient authority exists to support the proposition that Hobbs Act conspiracy is a crime of violence, *see supra* note 19 and accompanying text, and any error on this point is not plain.    *See United States v. Langston*, 662 F. App'x 787, 794 (11th Cir. 2016) ("[T]he district court did not plainly err because it is not obvious and clear under current law that conspiracy to commit Hobbs Act robbery is not a crime of violence under either the use-of-force clause or the § 924(c)(3)(B) residual clause.").

Motion for New Trial or Judgment of Acquittal that his right to due process was violated by use of the special verdict form.  (*See* ECF No. 815 at 13–14.)  The Court further agrees with the Government that this issue is time barred.  (*See* ECF No. 821 at 24–25.)  Under Rule 29, defendants "may move for a judgment of acquittal . . . within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(a).  Similarly, under Rule 33, "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b).  The Court extended the time by which Gillespie could file a post-trial motion multiple times and ordered him to file post-trial motions forthwith on June 23, 2015.  (ECF No. 764.)  Gillespie did not raise any issue with the special verdict form in his Motion for New Trial filed on June 24, 2015, (*see* ECF No. 765), nor did he raise the issue at trial.  Gillespie does not cite to any law within his brief on this ground, and he does not provide any specific reason why the special verdict form allegedly violated his due process rights.  (*See* ECF No. 815 at 13–14.)  The Court finds no basis to excuse Gillespie from the procedural requirements at this stage of the proceedings.  Thus, Gillespie's supplemental motion on this ground is denied.

## IV.  CONCLUSION

For the foregoing reasons, Johnson's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, (ECF No. 775), and Supplemental Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, (ECF No. 801), are **DENIED**.  Further, Gillespie's Motion for New Trial, (ECF No. 765), and Supplemental Motion[ ] for New Trial or Judgment of Acquittal, (ECF No. 815), are **DENIED**.

**IT IS SO ORDERED**.

84

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel,

the United States Attorney, the United States Probation Office, and the United States Marshal.


ENTER:        June 9, 2017


_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE